**FEDERAL TRADE COMMISSION,**

v.

**TRW, INC. and its unincorporated division, TRW Credit Data, Appellant.**

**No. 79–2100.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 13, 1980.

Decided June 3, 1980.

---

Robert H. Rawson, Jr., Washington, D. C., with whom Richard W. Pogue, Washington, D. C., was on the brief, for appellant.

Warren S. Grimes, Atty., F. T. C., Washington, D. C., with whom Michael N. Sohn, Gen. Counsel, and Jonathan W. Cuneo, Atty., F. T. C., Washington, D. C., were on the brief for appellee. Howard E. Shapiro, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for appellee.

Before McGOWAN, TAMM and ROBB, Circuit Judges.

Opinion for the Court filed by Circuit Judge McGOWAN.

McGOWAN, Circuit Judge:

This appeal is from an order of the District Court enforcing a subpoena duces tecum issued by the Federal Trade Commission. Appellant TRW, Inc. and TRW Credit Data (TRW), its unincorporated division, objected to the production of two classes of documents, claiming a so-called "self-evaluative" privilege and an attorney-client privilege, respectively, against their disclosure. The District Court rejected the two claims of privilege, and we affirm.

I

TRW is a credit reporting agency with numerous branch offices across the nation. It prepares and sells to credit grantors information about credit applicants, including the applicant's credit history and information gathered from public records. Like

other credit reporting agencies, TRW is comprehensively regulated by the provisions of the Fair Credit Reporting Act (FCRA), 15 U.S.C. §§ 1681 *et seq.* (1976).

The FCRA imposes restrictions on the manner and content of consumer reports, and provides individuals with a means of ensuring that the information being distributed about them is accurate and up to date. Credit reporting agencies are placed under a general obligation to maintain "reasonable procedures to assure maximum possible accuracy" of their consumer reports. 15 U.S.C. § 1681e. Specifically, the statute contains provisions that limit the purposes for which information may be supplied to third parties, 15 U.S.C. § 1681b, and that forbid the disclosure of information older than a certain age, 15 U.S.C. § 1681c. With a few enumerated exceptions, consumers are given a statutory right of access to the information concerning them in the agency's files, the sources of the information, and the parties to whom the information has been disclosed. 15 U.S.C. § 1681g. The FCRA also establishes a procedure by which consumers may challenge the accuracy or completeness of the information collected by the agency. 15 U.S.C. § 1681i. Although private enforcement procedures are available under the FCRA,[1] the FTC has responsibility for the general administrative enforcement of the Act.[2]

Pursuant to this authority, and following consumer complaints, the FTC in 1971 began an informal investigation of the credit reporting practices of TRW. By the fall of 1972, TRW was convinced that a complaint by the FTC was imminent. In response, it undertook what it termed a National Consumer Relations Audit (NCRA), the program which generated the first set of documents at issue in this case. Under the NCRA, in-house auditors checked TRW's consumer relations branch offices for compliance with federal and state fair credit reporting laws. The auditors then prepared reports containing their opinions as to compliance with law in the branch offices, as well as an identification of observed problems and suggested solutions. The reports were distributed to the affected branch managers, who submitted written responses outlining any corrective action that would be taken.

The purpose of the program was twofold: (1) to maintain uniform and consistent procedures in the numerous branch consumer relations offices throughout the country, so as to assure overall compliance with federal and state fair credit reporting laws, and (2) to provide management and legal counsel with information to be used in formulating new policies to assure compliance with such laws. In total, one hundred sixty-seven NCRA reports and responses are at issue.

In the summer of 1974, the FTC notified TRW that a substantial formal request for information and documents would soon be made. Following this notification, TRW engaged the Stanford Research Institute (SRI) in March 1975 to prepare a study of the company's complex computerized credit reporting system. A proposal was drawn up and signed by the parties on March 7, 1975, describing with particularity the work to be done by SRI. A preliminary report was submitted by SRI in mid-1975, and a final report in late November. These three documents constitute the second set sought to be protected by privilege from disclosure.

On June 21, 1976, the FTC issued a subpoena duces tecum ordering the production of some fifty categories of documents. TRW moved before the Commission to quash the subpoena, and a revised subpoena was promulgated in response that excluded from its scope twenty-six of the categories previously described. TRW complied with the revised subpoena by producing over

---

1. The FCRA provides civil remedies to injured consumers for willful and negligent noncompliance with the Act by credit reporting agencies. *See* 15 U.S.C. §§ 1681n & 1681o.

2. The FCRA provides, in pertinent part, that the FTC "shall have such procedural, investigative, and enforcement powers, including the power . . . to require . . . the production of documents . . . as though the applicable terms and conditions of the Federal Trade Commission Act were part of this subchapter," 15 U.S.C. § 1681s(a).

thirty thousand pages of documents; it withheld the documents that are the subject of the appeal.

On May 24, 1979, the FTC petitioned the District Court pursuant to the FTC Act, 15 U.S.C. § 49, for an order requiring TRW to produce the withheld documents. Following the submission of briefs and oral argument, the District Court on September 6 issued a Memorandum and Order granting enforcement of the FTC subpoena. Notice of appeal was filed and a stay of the enforcement order was granted upon the posting by TRW of a supersedeas bond in the amount of $150.[3]

## II

### A. *The National Consumer Relations Audit Reports and Responses*

TRW seeks to protect its NCRA reports and responses by means of a qualified "self-evaluative" privilege designed to encourage confidential self-analysis and self-criticism. The roots of the "self-evaluative" privilege are to be found in *Bredice v. Doctor's Hospital*, 50 F.R.D. 249 (D.D.C.1970).

In *Bredice*, a plaintiff in a malpractice action sought in the course of civil discovery to compel production of the minutes and reports of a hospital medical review committee's investigation of the death of a patient. The court noted that there was an "overwhelming public interest" in having the medical review committee's work proceed on a confidential basis, and found that this interest would be comprised by requiring disclosure of the committee's records. *See* 50 F.R.D. at 251. Accordingly, a qualified privilege against disclosure was fashioned to apply in all but "extraordinary circumstances," *id.*

A number of other courts have relied upon a "self-evaluative" privilege in diverse

factual settings, *see, e. g., Keyes v. Lenoir Rhyne College*, 552 F.2d 579 (4th Cir. 1977) (private action under Title VII of the Civil Rights Act of 1964); *Banks v. Lockheed-Georgia Co.*, 53 F.R.D. 283 (N.D.Ga.1971) (private employment discrimination suit); *New York Stock Exchange v. Sloan*, 22 Fed.R.Serv.2d 500 (S.D.N.Y.1976) (private action under the Securities Exchange Act of 1934). More recently, however, courts have appeared reluctant to enforce even a qualified "self-evaluative" privilege. They typically concede its possible application in some situations, but then proceed to find a reason why the documents in question do not fall within its scope. *See, e. g., Davidson v. Light*, 79 F.R.D. 137 (D.Colo.1978) (report of hospital's infection control committee following discovery of plaintiff's infected and gangrenous leg, *Wright v. Patrolmen's Benevolent Association*, 72 F.R.D. 161 (S.D.N.Y.1976) (deposition of offices of the state bar association in a civil rights action concerning information collected about plaintiff judge). As the court stated in *Lloyd v. Cessna Aircraft Co.*, 74 F.R.D. 518, 522 (E.D.Tenn.1977), the privilege "at the most remains largely undefined and has not generally been recognized."

■ Whatever may be the status of the "self-evaluative" privilege in the context of private litigation, courts with apparent uniformity have refused its application where, as here, the documents in question have been sought by a governmental agency. *See, e. g., Emerson Electric Co. v. Rumsfeld*, 609 F.2d 898 (8th Cir. 1979); *United States v. Noall*, 587 F.2d 123 (2d Cir. 1978); *Reynolds Metal Co. v. Rumsfeld*, 564 F.2d 663 (4th Cir. 1977). As a general matter this conclusion makes sense in light of the roots of the privilege in the public interest, and the strong public interest in having administrative investigations proceed expeditiously and without impediment:

---

**3.** The stay was granted as a matter of right pursuant to Rule 62(d) of the Federal Rules of Civil Procedure. A motion to vacate the stay was filed by the FTC, and referred by a motions panel of this court to us. We believe it is clear that stays of district court enforcement orders should be governed by the discretionary standards of Rule 62(c), and should not obtain as a

matter of right pursuant to Rule 62(d). Because of our disposition of the case at this time, however, we have no occasion to evaluate the property of a stay in light of the applicable prudential standards of *Washington Met. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C.Cir.1977).

"[T]he 'very backbone of an administrative agency's effectiveness in carrying out the congressionally mandated duties of industry regulation is the rapid exercise of the power to investigate. . . .' " *FTC v. Texaco, Inc.*, 180 U.S.App.D.C. 390, 400, 555 F.2d 862, 872 (D.C.Cir.) (*en banc*), *cert. denied*, 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977), *quoting FMC v. Port of Seattle*, 521 F.2d 431, 433 (9th Cir. 1975). This important governmental interest in the expeditious investigation of possible unlawful activity would be undermined if a party could use a subpoena enforcement action to raise the full panoply of objections to an administrative proceeding, *see Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 213, 66 S.Ct. 494, 508, 90 L.Ed. 614 (1946). *FTC v. Anderson*, 631 F.2d 741 at 744–745 (D.C.Cir. 1979).

An independent reason for declining to apply a "self-evaluative" privilege in this case is presented by the fact that the documents were sought pursuant to an FTC subpoena. In *United States v. Noall*, 587 F.2d 123 (2d Cir. 1978), Judge Friendly found any "self-evaluative" privilege inapplicable in the context of a proceeding to enforce an Internal Revenue Service production order. He asserted that the broad statutory IRS subpoena power left courts little discretion to second-guess legitimate agency requests:

> As is apparent, the factual setting of the cases recognizing a "self-evaluative" privilege is quite different from that here. Also all those cases arose in the course of discovery where the Rules of Civil Procedure leave much to the judge's discretion. With respect to enforcement of the tax laws, Congress itself has decided the policy issue, and it is not for the courts to challenge that determination.

587 F.2d at 126. The "policy issue" decided by Congress was that authorizing the IRS to order production of "such books, papers, records, or other data . . . as may be

relevant or material" to the inquiry. *See* 26 U.S.C. (I.R.C.1954) § 7602(2).

Congress likewise has accorded the FTC comparably broad investigatory and subpoena powers. Section 9 of the FTC Act, 15 U.S.C. § 49, gives the Commission access to "any documentary evidence of any corporation being investigated or proceeded against," and authorizes the production of subpoena of "all such documentary evidence relating to any matter under investigation." Whatever doubts may conceivably remain in the light of the explicit wording of the FTC Act regarding the breadth of the subpoena power conferred by it were dispelled by the Supreme Court in *United States v. Morton Salt Co.*, 338 U.S. 632, 642–43, 70 S.Ct. 357, 364, 94 L.Ed. 401 (1950);

> The only power that is involved here is the power to get information from those who best can give it and who are most interested in not doing so. Because judicial power is reluctant if not unable to summon evidence until it is shown to be relevant to issues in litigation, it does not follow that an administrative agency charged with seeing that the laws are enforced may not have and exercise powers of original inquiry. It has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.

We hold, accordingly, that no "self-evaluative" privilege shields the production of documents from an otherwise valid FTC subpoena.

## B. *The SRI Documents*

TRW argues that the three SRI documents are protected by the attorney-client privilege.[4] The District Court disagreed,

---

**4.** At oral argument, counsel for TRW forswore reliance upon the work product doctrine as a means of shielding the SRI documents from disclosure. It is thus inappropriate for us to

consider at this time the vitality of the doctrine in a subpoena enforcement proceeding, *see United States v. Bonnell*, 483 F.Supp. 1070 (D.Minn.1980), and its possible applicability to

reasoning primarily that the privilege does not extend as a general rule to documents prepared by third parties, such as SRI.[5] The court recognized exceptions to this general rule for ministerial agents of the attorney, and for other third parties whose services are essentially limited to the "translation" of data already on hand into a more easily understandable form. *See* Memorandum and Order at 5 n. 7. These exceptions, however, were held inapplicable to the "independent compilation and analysis performed by SRI." *Id.* Although we affirm the District Court's decision in this regard, our reasoning proceeds along a somewhat different route.

■ A line of appellate cases beginning with Judge Friendly's opinion for the court in *United States v. Kovel,* 296 F.2d 918 (2d Cir. 1961), has recognized that the attorney-client privilege can attach to reports of third parties made at the request of the attorney or the client where the purpose of the report was to put in usable form information obtained from the client. Thus in *Kovel* an accountant employed by a tax law firm to sit in on client's conversations with attorneys was held properly to have exercised an attorney-client privilege when he refused to answer questions in a grand jury concerning one such conversation. The court analogized the role of the accountant to that of a translator who puts the client's information into terms that the attorney can use effectively. Beyond this limited role, however, the privilege would not extend:

> What is vital to the privilege is that the communication be made *in confidence* for the purpose of obtaining *legal* advice *from the lawyer.* If what is sought is not legal advice but only accounting service, . . . , or if the advice sought is the accountant's rather than the lawyer's, no privilege exists.

the facts of this case, *cf. United States v. Nobles,* 422 U.S. 225, 238–39, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975).

5. The District Court also found that circulation of the SRI findings within TRW was inconsistent with the confidentiality requirement of the

296 F.2d at 922 (emphasis in original). On the strength of Kovel an attorney-client privilege has been accorded to a psychiatrist hired by the defense to aid in the preparation of an insanity defense, *United States·v. Alvarez,* 519 F.2d 1036, 1045–46 (3d Cir. 1975), an audit of the client prepared by an accountant at the attorney's request to aid in advising his client whether to file an amended tax return, *United States v. Cote,* 456 F.2d 142, 144 (8th Cir. 1972), and a statement of the client's net worth prepared by an accountant at the attorney's request, *United States v. Judson,* 322 F.2d 460, 462–63 (9th Cir. 1963).

We believe these holdings to be correct and necessary to preserve the effectiveness of counsel in our legal system. But, as recognized in *Kovel,* there must also be limitations on the protection accorded the work of third persons. Without such limitations, the attorney-client privilege would engulf all manner of services performed for the lawyer that are not now, and should not be, summarily excluded from the adversary process. TRW's claim of attorney-client privilege rests on this frontier of the law, still not well defined, separating those independent outside services performed for an attorney that are discoverable, from those that are not.

The foregoing law must be applied to the facts surrounding the preparation of the SRI documents, as those facts have been made known to us. TRW maintains that SRI was engaged to prepare its study in anticipation of a substantial request for information and documents by the FTC. The purpose of the study was ostensibly to put technical information concerning TRW's computerized credit reporting system into a form that lawyers could understand. The research proposal, itself one of the documents at issue in this case, contains the following description:

attorney-client privilege. While we are in general agreement with this conclusion, our reasons for denying application of the privilege in this case make it unnecessary to pursue the matter in detail.

This proposal has been prepared for the TRW Electronics' Legal Department at the request of Richard W. Pogue, Esq., of Jones, Day, Reavis & Pogue, and John E. Davis, Counsel for TRW, Inc., to enable them to advise TRW information Services on the status of its procedures under the Fair Credit Reporting Act.

*See* Brief of Appellant at 20. Little else has thus far been revealed about the content of the SRI documents.

Within the broad limits supplied by TRW, we can conceive of circumstances that might warrant application of an attorney-client privileged to the SRI documents. But other circumstances, equally plausible from the record before us, fall outside any reasonable definition of the privilege. This ambiguity is troublesome and, in the end, is the source of our resolution of the question.

▮ The burden is on the proponent of the attorney-client privilege to demonstrate its applicability. *See, e. g., United States v. Stern*, 511 F.2d 1364 (2d Cir. 1975). Where, as here, we have not been provided with sufficient facts to state with reasonable certainty that the privilege applies, this burden is not met. As noted earlier TRW's claim lies at an outer and indistinct boundary of the law of attorney-client privilege. Particularly where this is so, it is our responsibility to tread carefully, with as much precision as the facts before us permit. Where, by contrast, no precision is possible—where the absence of facts prevents a focused analysis—a court should be slow to define and to apply new law.

Having found that (1) in the case of the NCRA reports and responses, no "self-evaluative" privilege is available, and (2) TRW failed to meet its burden of demonstrating the applicability of an attorney-client privilege as to the SRI reports, we are without warrant to disturb the District Court's enforcement of the challenged subpoena; and that action is therefore affirmed.

*It is so ordered.*