**In re GRAND JURY PROCEEDINGS, etc. (File Sealed).**

**Civ. No. K–94–2153.**

United States District Court, D. Maryland.

Aug. 23, 1994.

Lynne A. Battaglia, U.S. Atty., and Christopher B. Mead, Asst. U.S. Atty., Baltimore, MD, William R. Zoffer, and the U.S. Dept. of Justice, Washington, DC, for government-movant.

Bonnie B. Anderson, William J. Hardy, Peter R. Mathers, and Kleinfeld, Kaplan & Becker, Washington, DC, for company.

James J. Graham, and Jones, Day, Reavis & Pogue, Washington, DC, for consultant.

FRANK A. KAUFMAN, Senior District Judge.

A grand jury of this Court, in the course of investigating a company subject to the jurisdiction of the federal Food and Drug Administration (FDA), has asked that company to produce to that grand jury certain documents which relate to audits of the company's operations by an outside consultant. The company, refusing so to do, has claimed a "self-evaluative" or "self-critical analysis" privilege with regard to the documents in question. The company makes regulatory submissions to, and is subject to inspections directed by, the FDA. The grand jury is investigating the company's compliance with the federal Food, Drug and Cosmetics Act, 21 U.S.C. §§ 301–394 (FDCA), as well as the possibility that the company has made false statements to FDA and/or has obstructed FDA inspections.

For several years, an expert in the field in which the company manufactures and sells has worked as an outside consultant to the company and has conducted audits to determine the company's compliance with the FDCA and its accompanying regulations. The consultant conducted those audits pursuant to a "Consultant Agreement" with the company which provided, *inter alia*, that the consultant's responsibilities would consist solely "of giving advice with respect to Federal and State regulatory matters," and stated that "the information given to Consultant by the Company shall be considered CONFIDENTIAL, and except as requested by the Company, in writing, Consultant shall not give any such information or use same, or any drawings, sketches or proprietary data, for any purpose not authorized by the Company."

Additionally, the company claims that it solicited audits such as those conducted by the consultant in reliance upon FDA Compliance Policy Guide 7151.02, dated March 1, 1983 and revised on June 3, 1989. That policy provides in pertinent part:

> FDA will not review or copy reports and records that result from audits and inspections of a written quality assurance program....
>
> FDA may seek written certification that such audits and inspections have been implemented, performed, and documented and that any required corrective action has been taken ...
>
> In addition, FDA may seek access to reports and records of such audits and inspections during a "directed" or "for-cause" inspection of a sponsor or monitor of a clinical investigation, during litigation (under applicable procedural rules), or by an inspection warrant where access to records is authorized by statute.
>
> FDA will continue to review and copy records and reports related to quality control investigations of product failures and manufacturing errors.

A grand jury subpoena has been served upon the company which demanded, *inter alia:*

> All documents that constitute, refer to, relate to, discuss, or pertain in any way to contacts or communication, prior to April 1, 1993, between the Company and outside consultants regarding matters within the regulatory jurisdiction of FDA.

A grand jury subpoena subsequently issued to the consultant calls for comparable material. To date, neither the company nor the consultant has complied with the subpoenas. In the within case, the United States has moved to compel such compliance, and it is that motion which is before this Court for decision at this time. The record in this case has been sealed because of the involvement of the grand jury. The company and the consultant have agreed, for purposes of this motion, that the company and the consultant

have been appropriately served, that the documents sought by the grand jury are responsive to the subpoenas, and that, for purposes of this motion, the relevance of the documents to the grand jury's investigation is not questioned. On its part, government counsel concedes that the company and the consultant have interposed timely assertions of the self-evaluative privilege.[1]

## Development of the Self–Evaluative Privilege

The privilege [of self-critical analysis] was first recognized in *Bredice v. Doctors Hosp., Inc.,* 50 F.R.D. 249 (D.D.C.1970), *aff'd,* 479 F.2d 920 (D.C.Cir.1973) (minutes of hospital staff meetings regarding procedures to improve patient care could be protected from discovery in a malpractice suit because of the important public interest in having hospitals critically evaluate the quality of the care they provide). The Supreme Court and the circuit courts have neither definitively denied the existence of such a privilege, nor accepted it and defined its scope.

*Dowling v. American Hawaii Cruises, Inc.,* 971 F.2d 423, 425 n. 1 (9th Cir.1992).

Although the privilege has been occasionally recognized and applied in instances involving private litigants, courts "have appeared reluctant to enforce even a qualified 'self-evaluative' privilege." *Federal Trade Comm'n (FTC) v. TRW, Inc.,* 628 F.2d 207, 210 (D.C.Cir.1980); *see also Etienne v. Mitre Corp.,* 146 F.R.D. 145, 147 (E.D.Va.1993) (noting that the privilege "has remained ... 'not generally recognized' ") (quoting *Guardian Life Ins. Co. v. Service Corp. Int'l,* Misc. No. 88–0395, 1989 WL 3496, at *3 (E.D.Pa. Jan. 17, 1989)). The Fourth Circuit apparently "has yet to apply the privilege to prevent disclosure of documents during discovery," *Etienne,* 146 F.R.D. at 148, but, on at least one occasion, "has upheld a trial court's refusal to require production of confidential faculty member evaluations in a discrimination suit ... [although] without mention of

---

1. Also, the consultant has agreed to follow the company's wishes with regard to the said pending motion and will turn over the requested documents if requested so to do by the company.

However, in an affidavit filed in this case, the consultant argues in favor of retaining the confidentiality of audits such as those which he conducted for the company.

the self-critical analysis privilege." *Id.* at 148 n. 7 (discussing *Keyes v. Lenoir Rhyne College,* 552 F.2d 579 (4th Cir.), *cert. denied,* 434 U.S. 904, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977)).[2]

[C]ourts have generally required that the party asserting the privilege demonstrate that the material to be protected satisfies at least three criteria: "first, the information must result from a critical self-analysis undertaken by the party seeking protection; second, the public must have a strong interest in preserving the free flow of the type of information sought; finally, the information must be of the type whose flow would be curtailed if discovery were allowed." Note, *The Privilege of Self–Critical Analysis,* 96 Harv.L.Rev. 1083, 1086 (1983). To these requirements should be added the general proviso that no document will be accorded a privilege unless it was prepared with the expectation that it would be kept confidential, and has in fact been kept confidential.

*Dowling,* 971 F.2d at 425–26.

Those courts which have recognized the privilege generally have required that a plaintiff seeking to overcome the privilege demonstrate an "exceptional need" for the materials protected by the privilege. Note, 96 Harv.L.Rev. at 1098; *see also, e.g., Keyes,* 552 F.2d at 581 (referring to the lack of a "further showing" of need by plaintiff for the requested documents); *Flynn v. Goldman, Sachs & Co.,* No. 91 Civ. 0035 (KMW), 1993 WL 362380, at *2, 1993 U.S.Dist. LEXIS 12801, at *4 (S.D.N.Y. Sept. 16, 1993) (stating that privileged notes "may not be disclosed

absent a showing by plaintiff of compelling need for those notes").[3]

**Courts Have Not Applied the Privilege Against the Government**

Whatever may be the status of the "self-evaluative" privilege in the context of private litigation, courts with apparent uniformity have refused its application where, as here, the documents in question have been sought by a governmental agency. As a general matter, this conclusion makes sense in the light of the roots of the privilege in the public interest, and the strong public interest in having administrative investigations proceed expeditiously and without impediment....

An independent reason for declining to apply a "self-evaluative" privilege in this case is presented by the fact that the documents were sought pursuant to an FTC subpoena....

Congress ... has accorded the FTC ... broad investigatory and subpoena powers.... Whatever doubts may conceivably remain in the light of the explicit wording of the FTC Act regarding the breadth of the subpoena power conferred by it were dispelled by the Supreme Court in *United States v. Morton Salt Co.,* [338 U.S. 632, 642–43, 70 S.Ct. 357, 364, 94 L.Ed. 401 (1950)];

... Because judicial power is reluctant if not unable to summon evidence until it is shown to be relevant to issues in litigation, it does not follow that an administrative agency charged with seeing that the laws are enforced may not

**2.** Judge Field, in *Keyes,* 552 F.2d at 581 (footnotes and citation omitted), wrote that had the defendant college in that case

sought to justify any male-female disparity [alleged by plaintiff] on the basis of these evaluations[,] the plaintiff should have been granted the opportunity to use them to demonstrate that the explanation was pretextual.... Here, however, the College did not resort to the evaluations for that purpose, and in the absence of some further showing on the part of the plaintiff, the district court's decision to protect these records from disclosure was not an abuse of its discretion.

**3.** Additionally, several courts "currently interpret the privilege of self-critical analysis to protect the evaluative but not the factual portions of self-

analyses." Note, 96 Harv.L.Rev. at 1093 (criticizing that distinction in some circumstances because of the expense, both in money and time, imposed upon courts and parties and because of the difficulty in distinguishing between "facts and evaluations"); *cf. United States v. Noall,* 587 F.2d 123, 127 (2d Cir.1978) (Friendly, J.) (commenting, in context of IRS subpoena, that requiring the "trial judge [to] examine the materials *in camera* ... [with regard to] their relevancy and materiality to the tax investigation, ... in most cases ... would be so burdensome and probably so impossible of performance that Congress could not have meant to impose it upon busy district judges"), *cert. denied,* 441 U.S. 923, 99 S.Ct. 2031, 60 L.Ed.2d 396 (1979).

have and exercise powers of original inquiry. It has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. *It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.*

*TRW,* 628 F.2d at 210–11 (emphasis added). *See also United States v. Dexter Corp.,* 132 F.R.D. 8, 9 (D.Conn.1990) (also noting that courts have not applied the privilege against governmental agencies). To date, the privilege has not only not been applied in the face of a grand jury subpoena, as far as this Court is aware it has not even been so asserted. Accordingly, this would appear to be a case of first impression.

### Privilege and the Grand Jury

In order, then, for this Court to apply the privilege in this case and refuse to grant the motion to compel, this Court would need to embark upon new territory.

Rule 501 of the Federal Rules of Evidence states that in cases in which federal law governs, privileges "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Rule 501 reflects Congress's intent to allow courts "flexibility to develop rules of privilege on a case by case basis." *University of Pa. v. EEOC,* [493 U.S. 182, 189, 110 S.Ct. 577, 582, 107 L.Ed.2d 571 (1990)].

*Dowling,* 971 F.2d at 425.[4]

The Supreme Court, in *Univ. of Pa.,* 493 U.S. at 189, 110 S.Ct. at 582, stated:

We do not create and apply an evidentiary privilege unless it "promotes sufficiently important interests to outweigh the need for probative evidence...." *Trammel v.*

*United States,* [445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980)]. Inasmuch as "[t]estimonial exclusionary rules and privileges contravene the fundamental principle that 'the public ... has a right to every man's evidence,'" [*id.* at 50, 100 S.Ct. at 912], *quoting United States v. Bryan,* [339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950)], any such privilege must "be strictly construed." [*Trammel,* 445 U.S. at 50, 100 S.Ct. at 912].

Moreover, ... we are disinclined to exercise this authority expansively. We are especially reluctant to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself. The balancing of conflicting interests of this type is particularly a legislative function.

(Blackmun, J.) (citations omitted).

As noted *supra,*

the grand jury has been accorded wide latitude to inquire into violations of criminal law.... The grand jury may compel the production of evidence or the testimony of witnesses as it considers appropriate, and its operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials.

....

The grand jury's sources of information are widely drawn, and the validity of an indictment is not affected by the character of the evidence considered.

*United States v. Calandra,* 414 U.S. 338, 343–345, 94 S.Ct. 613, 617–19, 38 L.Ed.2d 561 (1974); *see also TRW,* 628 F.2d at 211 (citing to the broad powers of the grand jury).

"Grand jury proceedings are constitutionally mandated ..., and 'its constitutional prerogatives are rooted in long centuries of Anglo–American history.'" *Branzburg v. Hayes,* 408 U.S. 665, 687, 92 S.Ct. 2646, 2660, 33 L.Ed.2d 626 (1972) (quoting *Hannah v.*

---

4. Because the grand jury in this case appears to be investigating the company with regard to possible violations of federal law, federal law seems to govern this dispute. *Cf.* Note, 96 Harv.L.Rev. at 1085 (commenting that, "in cases in which state law provides the rule of decision," a federal court should apply state law); Fed.R.Evid. 501 (stating that state laws of privilege apply "with respect to an element of a claim or defense as to which State law supplies the rule of decision"). Of course, the Federal Rules of Evidence themselves are not strictly applicable in the context of a grand jury investigation. *See United States v. Calandra,* 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974).

*Larche,* 363 U.S. 420, 489–90, 80 S.Ct. 1502, 1543–44, 4 L.Ed.2d 1307 (1960) (Frankfurter, J., concurring in result)). "Although the powers of the grand jury are not unlimited and are subject to the supervision of a judge, the longstanding principle that 'the public ... has a right to every man's evidence,' except for those persons protected by a constitutional, common-law, or statutory privilege, is particularly applicable to grand jury proceedings." *Id.,* 408 U.S. at 688, 92 S.Ct. at 2660 (citations omitted).

To limit the powers of a grand jury as the company requests in this case, in the light of the grand jury's historic powers and prerogatives, and in view of the Supreme Court's admonition that courts not exercise their privilege-making authority "expansively," *Univ. of Pa.,* 493 U.S. at 189, 110 S.Ct. at 582, would constitute an usurpation of the "legislative function." *Id., see also TRW,* 628 F.2d at 211; *Noall,* 587 F.2d at 126 (stating that, in a situation in which "Congress itself has decided the policy issue, ... it is not for the courts to challenge that determination").

Furthermore, to require the government to make a showing of need before granting the motion to compel in this case might be ill-advised in the fact-specific context of a situation such as this one in the light of the grand jury's traditional confidentiality and independence. *See Calandra,* 414 U.S. at 343, 94 S.Ct. at 617 (noting the secrecy and independence from judicial control of the grand jury).[5]

### Public Policy and the Company's Invocation of FDA Policy Guide 7151.02

The company, in the face of the above considerations, contends that to allow release of the requested materials to the grand jury would inhibit other companies in its industry from commissioning frank, independent reviews for fear of future prosecution. While that, indeed, presents what this Court considers to be an important concern, it is not altogether clear that the chilling effect of disclosure would be as great as the company and the consultant suggest. Incentives to obtain independent audits would still exist; for example, companies might desire such audits in order to become aware of, and to correct, defects and thereby avoid future civil liability. Additionally, even if the grand jury is permitted to obtain and review the materials in question, that does not necessarily indicate that those materials will be admissible at any eventual trial.[6] Additionally, notwithstanding any merit in the company's asserted policy concerns, those considerations should probably first be addressed to Congress or to the Executive Branch, before they are raised in a federal court proceeding of the within type. Absent direction from the legislature or the Executive, those concerns should not be permitted to outweigh the broad latitude historically accorded grand jury investigations without more compelling reason than appears to exist in this case at this time.

The company relies heavily upon the FDA's Policy Guide 7151.02, excerpted *supra,* which indicates that documents of the type involved in this case will remain confidential except pursuant to certain, listed exceptions.[7] In addition, the Policy Guide provisions as a whole arguably are directed to civil or administrative proceedings, rather

---

**5.** In its filings in this case to date, the government has not specifically made, or attempted to make, such a showing.

**6.** In a similar vein, it appears as if Fed.R.Crim.P. 6(e) provides the company with certain protections from disclosure of the audits to the public and/or to the FDA's administrative enforcement officials.

**7.** According to the company, that FDA policy constitutes an "advisory opinion" of that agency, "represent[ing] the formal position of the FDA ... [and] obligat[ing] the agency to follow it until it is amended or revoked." 21 C.F.R. § 10.85(e).

The government argues that the policy does not limit a grand jury investigation, pointing in that regard to the introduction to the Policy Guide, which provides in part:

The statements made in the Compliance Policy Guides are not intended to create or confer any rights, privileges, or benefits on or for any private person, but are intended merely for internal guidance.

The exceptions are described in the policy as:
(1) during a "directed" or "for-cause" inspection,
(2) during litigation, or
(3) by an inspection warrant where access to records is authorized by statute.

than to those of a criminal nature.[8] Indeed, the policy expressly allows access to audit materials in cases of "litigation" and during "for-cause" investigations, perhaps indicating an intent to permit disclosure in matters which arise beyond the routine. *A fortiori,* the policy seems to allow disclosure in a grand jury context.[9]

■ Similarly, the company's claim that only the FDA can decide to require disclosure outside of the listed exceptions in the Policy Guide seems without merit; as just explained, the FDA policy appears directed solely at non-criminal proceedings. Even, assuming *arguendo* only, that the FDA, through promulgation of a policy statement, can restrict the ability of a grand jury to investigate possible criminal wrongdoing in a regulated industry, the company has presented this Court with nothing indicating that that agency has attempted to accomplish that goal through Policy Guide 7151.02 or through any other policy statement or has ever indicated that it (the FDA) purports to speak for the entire federal government, including the Department of Justice. In fact, as the government's reply memorandum illustrates, the FDA expressly has approved the government's efforts in this case and supports the motion to compel. Surely before this Court divests a grand jury of its normal prerogatives, an express statement directing it so to do by Congress, or perhaps by the Executive, would seem needed, or at least prefera-

ble.[10] *Cf. Univ. of Pa.,* 493 U.S. at 189–90, 110 S.Ct. at 582–83; *TRW,* 628 F.2d at 211; *Noall,* 587 F.2d at 126 (all discussing the deference due legislative determinations with regard to the powers of governmental agencies in heavily regulated areas—civil rights, trade, and tax laws, respectively). "[S]ince the 'self-critical' privilege is rooted in promotion of the public interest, a court should take cognizance, in an action brought by the United States to enforce duly enacted laws, of Congress's role in declaring what is in the public interest." *Dexter,* 132 F.R.D. at 9.

## Conclusion

In view of (1) the admonition that courts sparingly should expand the application of privileges to new contexts and circumstances, (2) the absence of any case law applying the self-evaluative privilege against the government, as opposed to private parties, and (3) the traditionally wide latitude accorded to grand juries in their investigations of possible criminal activities, this Court, in a separate Order filed on August 18, 1994, has granted the government's motion to compel and has declined to apply the self-evaluative privilege to the documents in this matter, for purposes of the grand jury investigation.

8. By way of illustration, Maryland statutory law, which, as the company points out in its filing, provides for the confidentiality of certain loan review documents prepared for Maryland depository institutions, also confines that self-evaluative privilege to "civil action[s]." Md.Fin.Inst.Code Ann. § 1–205(c) (1993 Supp.).

9. Although this Court herein determines that the Policy Guide does not prohibit disclosure of the audit documents to the grand jury, this Court renews its suggestion, first stated by it during oral argument in this case, that the FDA may wish to re-examine its Policy Guide in order to set forth more clearly the circumstances under which audits of the type at issue here may be sought by the government in the future, perhaps with specific references to grand jury subpoenas, agency law enforcement proceedings, and other matters. In that regard, during oral argument, counsel for the company and the consultant stressed that their clients, and the industry involved, have interpreted Policy Guide 7151.02 to mean that documents and information of the

type at issue in this case would remain totally confidential and entirely exempt from compelled disclosure—other than through the specific exceptions listed in the Policy Guide—to any governmental body or to a grand jury. It is hard to believe that if counsel for the company and/or the consultant had been asked by their respective clients for their opinions in that regard, they would not in turn have sought advice from appropriate FDA and/or other government officials. That they did not do.

10. There is seemingly no basis here to support a claim of estoppel against the government. In order to estop the government, "[t]he government's acts or misrepresentations inducing reliance must be 'affirmative misconduct,' must be more than a mistake by an individual government employee." *Furcron v. United States,* 626 F.Supp. 320, 323 (D.Md.1986) (Young, J.). In this case, the company has demonstrated no facts which support a claim of "affirmative misconduct" on the part of the government.