Bart **ZEBROWSKI**, et al.,
Plaintiffs, Appellees,

v.

Michael H. **HANNA**, et al.,
Defendants, Appellees.

Salvatore **Altomare**, et al.,
Plaintiffs, Appellants.

No. 91–2184.

United States Court of Appeals,
First Circuit.

Heard May 7, 1992.

Decided Aug. 31, 1992.

Robert S. Sinsheimer with whom Sinsheimer & Levine, P.A., Boston, Mass., was on brief for plaintiffs, appellants.

Andrew Z. Schwartz with whom Foley, Hoag & Eliot, Boston, Mass., was on brief for defendants, appellees Michael Hanna and Soundings Seaside Resort Realty Trust.

Before BREYER, Chief Judge,
ALDRICH and COFFIN, Senior Circuit Judges.

BREYER, Chief Judge.

The legal issue before us concerns the scope of the district court's "inherent power" to "fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. Nasco, Inc.,* —— U.S. ——, ——, 111 S.Ct. 2123, 2133, 115 L.Ed.2d 27 (1991). The four appellants are plaintiffs in a lawsuit against a developer who had sold them, and retained mortgages on, condominiums, and who counterclaimed for second-mortgage payments. The plaintiffs told the district court they were providing

the defendant with some financial security, in case they lost, by making their mortgage payments into a kind of escrow account. They failed to make the payments, and the district court dismissed their claims. They argue on appeal that the court lacked the legal power to impose this type of "sanction." Given the circumstances here present, however, we conclude that the district court acted lawfully, and we affirm its judgment.

I

## The Key Events

We shall first set forth, in chronological order and in somewhat simplified form, the significant events that the record reveals.

1. *1985-86.* The four appellants, and twenty-four other initial plaintiffs in this case, bought Cape Cod condominiums from defendant Michael Hanna and the Soundings Seaside Realty Trust (collectively "Hanna"). They borrowed most of the money for the purchases, and Hanna held second mortgages on the properties.

2. *December 1988.* The twenty-eight plaintiffs sued Hanna, claiming that he had misled them in ways that violated federal securities laws, federal anti-racketeering laws, and various state tort and contract laws.

3. *February 1989.* Hanna, stating that the plaintiffs had stopped making monthly payments on their second mortgages, counterclaimed for the money due.

4. *Summer 1989.* The plaintiffs rented their condominiums to various vacationers. The vacationers paid rent to a condominium association (the "Association"), which collected the rents, deducted various expenses, and was to distribute the remaining rents to the condominium owners.

5. *September 7, 1989.* Hanna, in order to obtain pre-judgment security for his counterclaim, asked the district court to attach the Summer 1989 rents that the Association had collected, but had not yet distributed to the plaintiffs (about $54,000). We shall call this

$54,000, which, in a sense, belonged to the plaintiffs, the "rent-money asset."

6. *September 27, 1989.* The plaintiffs opposed Hanna's motion to attach their rent-money asset. They acknowledged that, if they lost their own lawsuit against Hanna, they would owe Hanna the mortgage payments. But, they argued that an attachment was not necessary to protect Hanna (in that event), for they had established a "trust" into which they were making their second-mortgage payments. The "trust" would pay the money to Hanna should he prevail in the litigation. Plaintiffs' counsel told the court:

[Plaintiffs] are paying their second mortgage payments to [Hanna] into a trust that we have set up unilaterally to show good faith and to show our interest in complying with proper conduct before the Court. Some of the plaintiffs may not be quite up to date.

Counsel added that he wanted to

"reemphasize that my clients are paying moneys into a trust in the unlikely event that they do not prevail in this litigation."

And, in response to Hanna's counsel's concern that the "trust" was not up to date, plaintiff's counsel (apparently referring to a previous written offer to make Hanna's counsel the "escrow agent") specified that if Hanna's counsel

"would like to be the custodian of the funds, I am sure that the plaintiffs would pay in if the Court thinks that that's really appropriate."

7. *March 2, 1990.* The court in a written order, relying expressly on counsel's September representations, denied Hanna's motion to attach the rent-money asset. In doing so, the court added that counsel had also indicated plaintiffs were willing to pay the "disputed amounts" into court or to Hanna's lawyers, who could act as "escrow agents" for the funds. The court told the parties to try to reach agreement about these arrangements in lieu of attaching the rent-money asset, and it

said that, failing an agreement, it would take the matter up again in April. (The court also denied plaintiffs' motion to attach Hanna's property, in part on the ground that, in the court's view, the plaintiffs did *not* have a strong likelihood of success on the merits of their claims.)

8. *March 6–10, 1990.* The bank that held first mortgages on the condominiums asked the Association for the $54,000 it held in rents belonging to the plaintiffs. The Association gave much of the money to that bank, and it released the rest to various plaintiffs (not appellants here). Thus, the $54,000 rent-money asset was dissipated and disappeared.

9. *April 3, 1990.* Hanna discovered that the plaintiffs had *not* made many of their second-mortgage payments to the plaintiffs' "trust." Some had paid nothing; others were far behind in their payments. The "trust" contained about $20,000, far less than the $56,000 that Hanna said they owed, and far less than the (now dissipated) $54,000 in rents that Hanna had sought to attach.

10. *April 4, 1990.* Hanna, pointing out that the $54,000 rent-money asset no longer existed and that the plaintiffs had not been making payments into the "trust," asked the court to insist that the plaintiffs make their second-mortgage payments into the "trust" as they had promised. The court made clear that it had denied the request to attach the rent-money asset because it had been

"represented to me ... that monies were being paid in [to the "trust"] and there was a willingness to enter into an escrow arrangement...."

Plaintiffs' counsel agreed that he had "argued" that the "trust ... might be handled by the defendants in lieu of an attachment." He said, however, that "it's really a moot issue." The court asked for written submissions.

11. *February 1, 1991.* The court determined that: 1) Hanna would likely win the litigation and be entitled to the second-mortgage payments; 2) but for plaintiffs' counsel's representations that plaintiffs were making those payments into a "trust" it would have permitted an attachment of the rent-money asset; 3) plaintiffs had failed to tell the court that they were not making the payments; and 4) Hanna had thereby lost its opportunity to attach the rent-money asset. The court consequently ordered the plaintiffs, jointly and severally, to pay the second-mortgage payments into escrow *in the amount of $54,000*, the amount of the rent-money asset and the pre-judgment security that Hanna had lost.

12. *February 27, 1991.* The court, *at plaintiffs' counsel's request and in a manner approved by plaintiffs' counsel,* modified its order. The modified order required each plaintiff individually to make second-mortgage payments into an escrow account and to cure past delinquencies. The order required two of the present appellants (Michael and Angela Feraco) to cure a delinquency of $2,995 and subsequently pay $106 per month for the duration of the litigation. It ordered the other two appellants (Salvatore Altomare and Marguerite Cross) to cure a delinquency of $9,577 and to pay $319 per month for the duration of the litigation.

13. *May 28, 1991.* The appellants did not make the payments that the court's order required. The court consequently dismissed their complaint and ordered judgment for Hanna on the counterclaim. It also awarded Hanna $8,000 in attorneys' fees (half to be paid by plaintiffs, half by their counsel).

As we have said, these four plaintiffs (the Feracos, Altomare, and Cross) now appeal.

## II

### *The Law*

Appellants concede, as they must, that a district court has "inherent power," not governed by "rule or statute," to manage

the litigation before it. *Link v. Wabash Railroad Co.*, 370 U.S. 626, 630, 82 S.Ct. 1386, 1388, 8 L.Ed.2d 734 (1962). This power includes the authority "to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, — U.S. at —, 111 S.Ct. at 2133. In the case before us, the court dismissed the appellants' claims when they failed to obey its February 27 individualized escrow payment order, an order that it had substituted (at plaintiffs' request) for its February 1, $54,000 substitute security order. The legal questions before us are three:

(1) Was the court's February 1 "Substitute Security" Order lawful?

(2) Was the court's February 27 "Individualized Escrow Payment" Order lawful?

(3) Was dismissal an "appropriate sanction" for the appellants' violation of the February 27 Order?

### A

### *The February 1 "Substitute Security" Order*

■ The district court's February 1 Order required the appellants to make their second mortgage payments (up to $54,000) into escrow as a substitute for the $54,000 rent-money asset that Hanna had lost. In our view, this Order represents a reasonable exercise of the court's "inherent power" to manage the litigation before it. In March of the previous year, the court had denied Hanna's request for pre-judgment security (by attaching the $54,000 rent-money asset) *solely* because it believed that attaching the rents held by the Association was unnecessary. It believed this because of plaintiffs' assurances that they had made, and would continue to make, their second-mortgage payments into an escrow account (either in the form of a "trust," or an account administered by Hanna's lawyers). In fact, by that same time (*i.e.*, by March), plaintiffs and their counsel *knew* that they had *not* fully paid their obligations under the second mortgages into an escrow account. They knew that the "trust" account contained, not the $56,000, or so, due, but less than $20,000. And,

apparently they did not intend to completely fulfill their escrow commitment. Yet, they neither corrected the court's impression about the escrow account, nor brought the matter to their opponent's attention, until *after* the court denied Hanna's rent-money asset attachment request (on March 2) and the Association had disbursed the rent-assets (on March 10).

Given these circumstances, the district court could reasonably believe 1) that Hanna had been deprived of his pre-judgment security through a series of events in which plaintiffs' assurances played a leading role, 2) that plaintiffs should have told the court (or Hanna) about the trust's size and about any change of heart about future escrow contributions, and 3) that they should have done so *before* the Association disbursed the rents that Hanna sought to attach, and which offered him some security for eventual payment. In our view, given these circumstances, the district court was fully justified in entering an order that sought to correct the unfairness (in respect to the attachment) for which plaintiffs were responsible.

The Order was not unfair to the plaintiffs. It simply required them partially to live up to their past promise (to make payments into escrow); it obliged them (as a group) to place in escrow $54,000, an amount equivalent to the amount of security (for eventual receipt of those payments, assuming a legal victory) that Hanna had lost. That amount was almost equivalent to the mortgage payments that the plaintiffs had (by then) withheld.

■ The court had adequate legal authority to enter the Order. A court has inherent power to regulate the litigation before it in order to preserve money likely to be the subject of the final judgment. *See Bogosian v. Woloohojian Realty Corp.*, 923 F.2d 898, 900 (1st Cir.1991); *cf. HMG Property Investors, Inc. v. Parque Industrial Rio Canas, Inc.*, 847 F.2d 908, 916 (1st Cir.1988). A court also has the legal power to estop parties from breaking promises that counsel makes on their behalf. *See Asociacion de Empleados del Instituto de Cultura Puertorriquena v.*

*Rodriguez Morales*, 538 F.2d 915 (1st Cir. 1976) (dismissal for breach of "solemn commitment" to file reply, despite court order); *International Graphics, Division of Moore Business Forms, Inc. v. United States*, 5 Cl.Ct. 97 (1984) (granting motion to compel compliance with party's representation to court that it would not contact certain individuals). The Order before us is justified either way. *See HMG Property Investors*, 847 F.2d at 915–16 (court ordered mortgagor to pay accrued property tax liability or post security bond to protect interests of mortgagee); *Bogosian*, 923 F.2d 898 (affirming district court order requiring monthly payments during pendency of litigation as security for payment to which plaintiff might become entitled); *see also Fox v. First Bank*, 198 Conn. 34, 501 A.2d 747 (1985) (court order to party to make monthly payments on car).

Appellants have made three basic arguments to the contrary. First, they argue that they are not at fault because circumstances changed between September, when they made their escrow promise, and March, when the court denied Hanna's attachment motion. In particular, sometime during the Fall the bank holding the first mortgages foreclosed on their condominiums. This foreclosure left them without property able to earn the revenues that would have helped them make the second-mortgage payments. The flaw in this argument, however, lies not in the significance or seriousness of the changed circumstances, but in plaintiffs' *failure to call those circumstances and their significance to the attention of the district court or to their opponent* before the Association disbursed the rents on March 10. Had they done so, the court could have avoided the disbursal of the rent-money asset; it could have permitted the $54,000 attachment; and, Hanna would have had his security without plaintiffs having to make any added contribution.

Second, the appellants argued below that the bank holding the first mortgages was entitled to the $54,000 rent-money asset ahead of Hanna. On this view, Hanna lost nothing through disbursal of the rent-money asset, and fairness therefore does not require the plaintiffs to replace the money lost through its disbursal. The short, conclusive answer to this claim is that the record before us contains nothing that suggests the bank possessed any interest in the rent-money asset superior to the interest Hanna would have obtained through attachment. As far as the record is concerned, the rents belonged to the plaintiffs, not to the bank. The bank apparently foreclosed on the condominiums in the Fall of 1989. But an Autumn foreclosure did not give the bank an interest in rents earned the *preceding* Summer which would have taken precedence over an interest that a judicial attachment would have given to Hanna. *See In re Prichard Plaza Associates Ltd.*, 84 B.R. 289, 297 (Bankr.D.Mass. 1988); *In re Ledgemere Land Corp.*, 116 B.R. 338, 341 (Bankr.D.Mass.1990). Indeed, the bank, apparently aware of the attachment proceedings, did not argue to the district court that it had a prior right to the rents; rather, it asked for that money only after the court denied Hanna's attachment motion.

Third, appellants call to our attention voluminous legal authority denying the existence of any duty "to amend" or "to update," during the course of litigation, pleadings that are "valid and fair." The problem with this argument is that the authority they cite concerns a court's authority to sanction behavior under Fed. R.Civ.P. 11, a rule that focuses upon the accuracy of documents that lawyers file in court. But the court's February 1 Order does not rest upon the authority of Rule 11. Rather, its Order rests upon its inherent authority to manage its proceedings fairly and expeditiously. Its Order enforced plaintiffs' promise to the extent necessary to prevent a specific unfair result—the disappearance of potential prejudgment security—for which disappearance plaintiffs' statements, actions and inactions, are in large part responsible. In our view, the court may enter such an Order. *See* cases cited at pp. 1004–05, *supra.*

We conclude that the court's February 1 Order was lawful.

## B

### *The February 27 "Individualized Escrow Payment" Order*

The February 27 "Individualized Escrow Payment" Order, in one sense, imposes a greater burden on the appellants here than the February 1 "Substitute Security" Order, for it requires them to continue their second-mortgage payments whether or not the *total* amount they pay into escrow exceeds their proportionate share of the $54,000 security that Hanna might otherwise have obtained from attaching the Association rents. Thus, the Order required the Feracos to make back payments into escrow of $2,995 and to pay $106 into escrow each month thereafter during the lawsuit. It required Altomare and Cross to make back payments of $9,577 and to pay $319 monthly thereafter. The Feracos' share of the $54,000 rents amounted to $3,410; that of Altomare and Cross amounted to $5,687.

The appellants, however, *agreed* that the court should enter this second Order, as a substitute for the February 1 Order (which they reserved their right to attack on appeal). Apparently, the plaintiffs, as a group, preferred the second Order to the first Order because they preferred a requirement that they make the escrow payments individually, rather than collectively. We note that this second Order, like the earlier Order, merely holds them to their initial representations to the court. But, in any event, given their agreement, they cannot complain about this aspect of the Order on appeal; and, as we read their brief they do not explicitly do so.

## C

### *The Dismissal*

■ If the Orders are lawful, the court's dismissal of appellants' claims for failure to obey the Orders is equally lawful. In situations like those in the cases discussed in Part A, pp. 1004–05, *supra*, it is not unusual for a court to exercise its inherent power to order security in the interest of regulating the litigation before it. Nor is it unusual to require a party to post prejudgment, or post-judgment, security as a condition for continuing litigation in far more mundane actions, where there is not necessarily a hint of a party's misconduct. *See, e.g., Sckolnick v. Harlow*, 820 F.2d 13 (1st Cir.1987) (affirming district court order for bond under Fed.R.App.P. 7); Fed. R.Civ.P. 62(c) (bond for injunction pending appeal); Fed.R.Civ.P. 62(d), 74(c) (bond for stay upon appeal); Fed.R.Civ.P. 64 (attachment), Fed.R.Civ.P. 65(c) (security for preliminary injunction); Fed.R.App.P. 7 (bond for costs on appeal in civil cases); Fed. R.App.P. 8(b) (bond for stay or injunction pending appeal); Fed.R.App.P. 41(b) (security for stay of mandate pending application for certiorari).

Dismissal of a claim is not an unusual sanction for failure to carry out a lawful court order requiring a party to provide some sort of security, whether ordered under the court's inherent power or under procedural rules. *See, e.g., Sckolnick*, 820 F.2d 13 (declaring that failure to comply with order for bond under Fed.R.App.P. 7 should result in dismissal); *Atlanta Shipping Corp. v. Chemical Bank*, 818 F.2d 240 (2d Cir.1987) (affirming district court's dismissal for party's failure to post bond designed to assure defendant recovery of costs if it prevailed); *HMG Property Investors*, 847 F.2d 908 (affirming dismissal under inherent power of plaintiff's case for failure to post bond to preserve res); *Ehm v. Amtrak Board of Directors*, 780 F.2d 516 (5th Cir.1986) (affirming dismissal for failure to post bond for costs, under inherent power and local rule); *cf.* Fed.R.Civ.P. 41(b) (involuntary dismissal for failure to comply with court order).

The district court's decision to dismiss appellants' claims, rather than to modify, or to overlook their violation of, its Orders, represents a reasonable balancing of several considerations. On the one hand, appellants are not wealthy. The record indicates that the Feracos have net assets (including a home) that (apart from amounts involved in this litigation) amount to about $140,000. If we consider Altomare and Cross as a single investment unit, their joint incomes amount to about $3,700 per month, from which they must pay numerous expenses.

It may, indeed, be difficult for appellants to find the money ($110 and $319 per month, plus back payments) to bring their second-mortgage payments up to date. Moreover, since the bank holding the first mortgage on the condominiums has foreclosed, the appellants cannot rent the condominiums and use the rents to help meet their second mortgages.

On the other hand, unless the appellants prevail on their basic fraud-related claims against Hanna, they must pay him the second-mortgage money regardless. And, the district court here reasonably determined that the likelihood of Hanna eventually prevailing is strong. Moreover, the appellants have not claimed indigence. *Cf. Aggarwal v. Ponce School of Medicine*, 745 F.2d 723 (1st Cir.1984). Finally, as we have described at length, the appellants, ultimately, are responsible for creating the circumstances that led to the Orders they violated. Dismissal, as a sanction for failure to live up to those Orders, is lawful. *See, e.g., HMG Property Investors*, 847 F.2d 908; *Atlanta Shipping Corp.*, 818 F.2d 240; *cf. Usaco Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94 (6th Cir.1982).

We turn to appellants' three final arguments. First, they point to *Boettcher v. Hartford Insurance Group*, 927 F.2d 23 (1st Cir.1991) as contrary authority. In that case, this court refused to permit a district court to assess an unusual sanction—a sanction requiring a party, who settled a case after a jury had been called, to pay the costs of the jury. The parties in *Boettcher*, however, would not likely have expected to suffer the unusual sanction of paying for a jury. Unlike in *Boettcher*, nothing of significance seems unusual here. At bottom, the court has done no more than require the parties to live up to a promise to provide security that plaintiffs initially made in September 1989.

Second, they argue that they are being required to pay a fee in order to pursue their case, which requirement, they say, violates the federal constitution. U.S. Const. amend. XIV, § 1. We can find no "unconstitutional fee," however, in a series of events that simply requires a party to live up to a promise to provide security against an adverse counterclaim judgment.

Third, appellants point to a recent case, *Connecticut v. Doehr*, — U.S. —, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991), which held that courts normally must provide procedural due process, consisting of pre-attachment hearings, before permitting one party to attach an asset belonging to another. The short answer to this argument is that the court held full hearings prior to deciding whether it would grant Hanna's motion to attach (or would have done so absent appellants' promise). We can find no violation of the requirements of *Doehr*.

For these reasons, the judgment of the district court is

*Affirmed.*