UNITED STATES Of America, ex rel.
Frank FALSETTI and Nancy D'Alessio,
Frank Falsetti, individually, and Nancy
D'Alessio, individually, Plaintiffs,

v.

SOUTHERN BELL TELEPHONE AND
TELEGRAPH COMPANY,
Defendant.

No. TCA 91–40267–WS.

United States District Court,
N.D. Florida,
Tallahassee Division.

Jan. 25, 1996.

David Long, U.S. Atty Special, U.S. Department of Justice, Civil Division, Washington, DC, for U.S.

Joseph C. Jacobs, Tallahassee, FL, Barry Richard, Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, Tallahassee, FL, Teresa A. Ferrante, Pro Hac Vice, Spiegel & McDiarmid, Washington, DC, for Frank Falsetti.

Charles Everett Boyd, Ervin, Varn, Jacobs, Odom and Ervin, Tallahassee, FL, Joseph C. Jacobs, Tallahassee, FL, Barry Richard, Greenberg, Traurig, Hoffman, Lipoff, Rosen and Quentel, Tallahassee, FL, Teresa A. Ferrante, Pro Hac Vice, Bradley Scott Weiss, Pro Hac Vice, Spiegel & McDiarmid, Washington, DC, for Nancy D'Alessio.

William S. Graessle, Robert J. Winicki, Pro Hac Vice, William H. Adams, III, Pro Hac Vice, Fred Ashmore Walters, Pro Hac Vice, Mahoney, Adams & Criser, P.A., Jacksonville, FL, Don H. Lester, Don Lester, P.A., Jacksonville, FL, William W. Deem, Pro Hac Vice, Mahoney, Adams, Criser, Jacksonville, FL, for Southern Bell Telephone and Telegraph Company.

## ORDER

SHERRILL, United States Magistrate Judge.

▮ This *qui tam*[1] suit is brought by Plaintiffs on their own behalf and on behalf of the United States pursuant to the False Claims Act, 31 U.S.C. § 3729, et seq. Plaintiffs also bring separate actions for retaliation pursuant to 31 U.S.C. § 3730(h). Plaintiffs allege that Defendant knowingly billed the United States for telephone access lines which it knew were out of service, failed to provide refunds as required by law and contract, and knowingly billed the United States for service not provided. In part the relief sought is a civil penalty ranging from a minimum of $5,000 to $10,000 for each instance in which a false claim was billed to the United States. Doc. 1.

Pending is Plaintiffs' motion to compel, doc. 125, and related memoranda and motions, docs. 126, 140, 149, 150, and 152, and Defendant has filed a reply memorandum, doc. 135, and supplemental memoranda and motions, docs. 146, 157, 158, 159, 160, 168, and 170.

By this motion to compel Plaintiffs seek production of all documents relating to any internal investigation Defendant conducted related to the Florida Public Service Commission docket no. 910163–TL, *In re: Investigation into the Integrity of Southern Bell's Repair Service Activities and Reports.* In particular, the motion seeks production of (1) written statements taken primarily in 1991 from 650 of Defendant's managers and craft personnel in Florida, (2) five repair service audits conducted in 1991 and two reaudits conducted in 1993, and (3) disciplinary recommendations made by a panel concerning 207 employees, worknotes of Defendant's Human Resources personnel, and notes of Defendant's managers Cuthbertson and Mower. Doc. 126, pp. 4–8.[2]

Defendant objects, asserting three privileges: self-critical analysis, attorney work product, and attorney-client. *Id.,* p. 2. There is little dispute by the parties that these documents would otherwise be relevant to the claims in this case and discoverable absent privilege.

## I. The self-critical analysis privilege

A self-critical analysis privilege has been recognized by various district courts for the past 25 years beginning with *Bredice v. Doctors Hospital, Inc.,* 50 F.R.D. 249 (D.D.C. 1970), *aff'd without opinion,* 479 F.2d 920 (D.C.Cir.1973). Acknowledging that the privilege has not been universally accepted or applied,[3] Judge Vinson of this district

---

**1.** " 'Qui tam' is an abbreviation for 'qui tam pro domino rege quam pro seipso,' which literally means 'he who as much for the king as for himself.' " *U.S. ex rel. S. Prawer and Co. v. Fleet Bank of Maine,* 24 F.3d 320, 324 (1st Cir.1994).

**2.** Plaintiffs do not seek to compel production of a "statistical analysis" and "summaries of employee statements," or notes, thoughts, and impressions of counsel redacted with proper attribution

from the panel discipline recommendations. Doc. 126, p. 14, n. 21.

**3.** In addition to the cases cited by Judge Vinson, see *Griffith v. Davis,* 161 F.R.D. 687, 701 (C.D.Cal.1995); *Aramburu v. Boeing Company,* 885 F.Supp. 1434 (D.Kan.1995); *Mason v. Stock,* 869 F.Supp. 828, 834–835 (D.Kan.1994); *In re Grand Jury Proceedings,* 861 F.Supp. 386, 387–

recently recognized and applied a self-critical analysis privilege for retrospective self-assessment of compliance with environmental regulations. *Reichhold Chemicals, Inc. v. Textron, Inc.,* 157 F.R.D. 522, 525–526 (N.D.Fla.1994) (tab G, attachment to doc. 135).

The privilege was recognized in *Reichhold* pursuant to Fed.R.Evid. 501. 157 F.R.D. at 526. Citing *University of Pennsylvania v. E.E.O.C.,* 493 U.S. 182, 189, 110 S.Ct. 577, 582, 107 L.Ed.2d 571, 582 (1990), Judge Vinson noted that the power to recognize a new common law privilege

> ... is not to be exercised expansively. Id. A court should recognize a privilege when it "promotes sufficiently important interests to outweigh the need for probative evidence." Id. (quoting *Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 912, 63 L.Ed.2d 186, 195 (1980).

*Id.* The court observed, however:

> The privilege protects an organization or individual from the Hobson's choice of aggressively investigating accidents or possible regulatory violations, ascertaining the causes and results, and correcting any violations or dangerous conditions, but thereby creating a self-incriminating record that may be evidence of liability, or deliberately avoiding making a record on the subject (and possibly leaving the public exposed to danger) in order to lessen the risk of civil liability.

157 F.R.D. at 524. The court further reasoned:

> The fact that an actor had actual prior knowledge of the harm that would or could result from a course of action, and, nevertheless, deliberately chose to act is highly relevant in a negligence action and should ordinarily be discoverable. However, ret-

rospective analysis is generally not relevant.

157 F.R.D. at 527.[4]

*University of Pennsylvania v. E.E.O.C.* is especially important for it sets forth the rules for determining generally whether a new privilege exists under Rule 501. There, plaintiff claimed discrimination due to her race, sex, and national origin in violation of Title VII. 493 U.S. at 185, 110 S.Ct. at 580. Plaintiff, an associate professor at the Wharton School of Business, alleged that her department chairman had sexually harassed her, and that when she had rebuffed him, had submitted a negative letter to the tenure committee. She had been denied tenure. In discovery, she sought documents produced by those who had denied tenure: confidential letters written by her evaluators, the chairman's letter of evaluation, and documents reflecting the internal deliberations of the tenure committee on her application and the applications of competitors. 493 U.S. at 186, 110 S.Ct. at 580. The University objected to the discovery, arguing that the materials were protected by a common law "academic peer review" privilege.

The Court held that while there is authority under Rule 501 to develop a new rule of privilege on a case-by-case basis, that authority must not be exercised expansively. 493 U.S. at 189, 110 S.Ct. at 582.[5] With particular pertinence to the case at bar, the Court held:

> We are especially reluctant to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself. *Cf. Branzburg v. Hayes,* 408 U.S. 665, 706, 92 S.Ct. 2646 [2669], 33 L.Ed.2d 626 (1972). The balancing of con-

391 (D.Md.1994); *Reich v. Hercules, Inc.,* 857 F.Supp. 367, 371 (D.N.J.1994).

**4.** See e.g. *Dowling v. American Hawaii Cruises, Inc.,* 971 F.2d 423, 427 (9th Cir.1992), finding no self-critical analysis privilege applicable for *pre-accident* safety reviews.

**5.** *Accord United States v. Corona,* 849 F.2d 562 (11th Cir.1988), which declined to recognize a

psychotherapist-patient privilege in federal criminal trials. Quoting *United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974), the Eleventh Circuit said that "privileges 'are not lightly created nor expansively construed, for they are in derogation of the search for truth.'" 849 F.2d at 567.

flicting interests of this type is particularly a legislative function.

*Id.*

The Court then reviewed the history of Title VII, noting that Congress had opportunities to consider the privilege asserted when it amended the statute to subject tenure decisions to Title VII, but had declined to do so. It found that Congress had created a limited sort of confidentiality, forbidding the disclosure of the materials except to the charging party prior to institution of a "proceeding" under the Act. While this protection was admittedly "less than complete," the Court found that "this, if anything, weakens petitioner's argument. Congress apparently considered the issue of confidentiality, and it provided a modicum of protection." 493 U.S. at 193, 110 S.Ct. at 584.

In recognition of the probable centrality of the evidence in peer review files where a Title VII claim is made that the tenure decision was biased, the Court said that: "Indeed, if there is a 'smoking gun' to be found that demonstrates discrimination in tenure decisions, it is likely to be tucked away in peer review files." *Id.* It also reasoned that it would be conceptually difficult to confine the privilege to the academic setting, noting that others who claim a significant role in furthering speech and learning in society, such as writers, publishers, musicians, and lawyers, would claim the privilege. 493 U.S. at 194, 110 S.Ct. at 585. Finally, the Court observed that the privilege claimed had no significant historical or statutory basis. 493 U.S. at 195, 110 S.Ct. at 585.

The documents sought in the case at bar are significantly different from those sought in *University of Pennsylvania v. E.E.O.C.* Had the Court there found an "academic peer review" privilege, the privilege would have prevented discovery of what might have been primary evidence of plaintiff's Title VII claim. For example, the chairman's letter to the tenure committee might have contained evidence of his past discriminatory actions and his intent to discriminate, or it might have contained evidence in defense. Further, if the chairman had otherwise affected the tenure decision in an unlawful manner,

the letter itself when transmitted (which was presumably negative) might have been an act actionable under Title VII.

That result would not occur here should a privilege be recognized. The documents sought here did not contemporaneously record the events and actions which give rise to Plaintiffs' claims, nor are the documents themselves communicative acts upon which the claims are premised. The documents only contain evidence of past events, gathered and analyzed after-the-fact. Should a privilege be recognized, Plaintiffs would be denied access to Defendant's own fact-gathering and analysis, but arguably can gather the same facts and analyze them for themselves.

Thus, while the "academic peer review" privilege sought in *University of Pennsylvania v. E.E.O.C.* concerned retrospective evaluations of the behavior of instructors seeking tenure, the privilege sought was not directly or necessarily concerned with self-criticism of the matter as to which the claim was made, the Title VII behavior of the University itself. In contrast, the self-critical analysis privilege recognized by Judge Vinson in *Reichhold* and which Defendant seeks here protects from disclosure the results of investigative activities which occurred after the events giving rise to the claim, and which concern historic events which themselves are central to the claim. For this reason, the privilege sought here is in a context indistinguishable from that in the *Reichhold* case.

■ Nonetheless, since the claims in this case have a different federal basis than those in *Reichhold,* this court must first determine whether, in enacting the False Claims Act, "Congress has considered the relevant competing concerns." That should be the first question to resolve when confronted with a claim of a new privilege under Fed.R.Evid. 501. *University of Pennsylvania v. E.E.O.C.,* 493 U.S. at 189, 110 S.Ct. at 582.

■ Congress has had a long history of attempting to achieve delicate balances with respect to the *qui tam* provisions of the

False Claims Act.[6] The Senate Report accompanying the 1986 amendments to the False Claims Act found that Government fraud may range from $10 billion to $100 billion annually. S.Rep. No. 345, 99th Cong., 2d Sess. 2 (1986), *available on WestLaw*, 1986 WL 31937 (Legis.Hist.), p. 2. Fraud was found to "permeate all Government programs." *Id.* The report found that "[f]raud is perhaps so pervasive and, therefore, costly to the Government due to a lack of deterrence." *Id.*, p. 3. It was reported that after hearings and research, "[i]t appears there are serious roadblocks to obtaining information as well as weaknesses in both investigative and litigative tools." *Id.* "Detecting fraud is usually very difficult without the cooperation of individuals who are either close observers or otherwise involved in fraudulent activity." *Id.*

Examples were cited of employees who chose to report fraud, but found no one within the company to do anything about it; and worse, the company retaliated against the employee. *Id.*, p. 4. It was further observed: "Currently, in judicial districts observing an 'actual knowledge' standard, the Government is unable to hold responsible those corporate officers who insulate themselves from knowledge of false claims submitted by lower-level subordinates." *Id.*, p. 5. This circumstance was termed a "conspiracy of silence." *Id.*, p. 4. It was found that while honest mistakes should not be punished, "those doing business with the Government have an obligation to make a limited inquiry to ensure the claims they submit are accurate." *Id.*, pp. 5–6. Finally, additional problems for the Government effectively to investigate and enforce the False Claims Act were found due to a "resource mismatch" "when large, profitable corporations are the subject of fraud investigation and able to devote many times the manpower and re-

sources available to the Government." *Id.*, p. 6. The purpose of the amendments, therefore, was "not only to provide the Government's law enforcers with more effective tools, but to encourage *any* individual knowing of Government fraud to bring that information forward." *Id.*, p. 1 (emphasis added).

In the 1986 amendments Congress established rather substantial new penalties. The court must now assess a civil penalty of not less than $5,000 nor more than $10,000, and 3 times the amount of damages suffered by the Government for each act described in 31 U.S.C. § 3729(a). But Congress also enacted an exception. The penalty is limited to "not less than 2 times the amount of damages" if "the person committing the violation ... furnished officials of the United States responsible for investigating false claims violations with all information known to such person about the violation within 30 days after the date on which the defendant first obtained the information," "fully cooperated with any Government investigation of such violation," and, "at the time such person furnished the United States with the information about the violation, no criminal prosecution, civil action, or administrative action had commenced under this title with respect to such violation, and the person had no actual knowledge of the existence of an investigation into such violation." 31 U.S.C. § 3729(a)(1–7)(A–C).

By the omission of reference to the minimum mandatory $5,000 civil penalty, Congress meant that the exception would be a safe-haven for persons who uncover past violations and act promptly to disclose the same to Government investigators. Congress also provided that information voluntarily disclosed is exempt from disclosure pursuant to 5 U.S.C. § 552 (the Freedom of Information Act). 31 U.S.C. § 3729(d).

---

**6.** The Act was signed into law by Abraham Lincoln in 1863. S.Rep. No. 345, 99th Cong., 2d Sess. 2 (1986), *available on WestLaw*, 1986 WL 31937 (Legis.Hist.), p. 6. "The history of the FCA *qui tam* provisions demonstrates repeated congressional efforts to walk a fine line between encouraging whistle-blowing and discouraging opportunistic behavior." *United States ex rel. S. Prawer and Co. v. Fleet Bank of Maine*, 24 F.3d 320, 326 (1st Cir.1994), quoting *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14

F.3d 645 (D.C.Cir.1994). *Fleet Bank of Maine* traces that history in another context, describing the Congressional adjustments as the balance shifted back and forth as a consequence of judicial decisions, notably *United States ex. rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), which was an expansive interpretation of the *qui tam* remedy, and *United States ex rel. State of Wisconsin v. Dean*, 729 F.2d 1100 (7th Cir.1984), which represented a constriction of the remedy.

Congress, therefore, has already considered the competing interests. Whether it resolved those competing interests correctly is not to be decided by this court.[7] This court's inquiry ends with the finding, which is compelled by the above, that Congress has provided its own version of a self-critical analysis privilege. In view of the enactment by Congress of sections 3729(a)(1–7)(A–C) and 3729(d), a self-critical analysis privilege does not exist in a *qui tam* action brought under the False Claims Act.

## II. The attorney-client and attorney work product privileges

■ The existence and scope of attorney-client and attorney work product privileges in the same documents has been the subject of extensive litigation before the Florida Public Service Commission. *Southern Bell Telephone and Telegraph Company v. Deason,* 632 So.2d 1377 (Fla.1994) (tab B, attachment to doc. 135). For the most part the Florida Supreme Court, and the Florida Public Service Commission on remand, have rejected Defendant's claims as to those privileges. Defendant sought review of the Public Service Commission's rulings on remand, but the Florida Supreme Court has denied review.[8]

Despite these rulings and Florida's rather broad public records law, to date the Florida Public Service Commission retains the records *in camera* as non-public records. Defendant has filed a motion in that forum for return of its records without disclosure to anyone. Thus, the questions for this court to decide have not been mooted, as a practical matter, by the state court litigation.

Plaintiffs argue that Defendant waived its right to litigate these privileges again in this court by statements counsel made at the scheduling conference and hearing on motions to compel. Adjudication of this requires a review of that hearing which occurred on July 25, 1995.

■ In that hearing, the court's concern that the parties reach agreement and simpli-

fy the litigation of this case is rather plain from the transcript. The court's first words of substance to counsel were: "All right. Well, now, do we have a schedule? Are you telling me you have finally agreed on something?" Doc. 121, pp. 3–4. When counsel for Plaintiffs represented that an agreement had been reached, the court said: "If you are in agreement, we don't need to spend any more time, just put it in writing and get it to me." *Id.*

Then ensued a lengthy description of various matters to which the parties had agreed. Pertinent to this issue are the following excerpts, with emphasis added:

MR. BOYD (for Plaintiffs):

> . . . we have resumed discovery and we anticipate within the next two or three weeks two or three sets of motions to compel relating to the discovery issues. We've been trying to cooperate, *and we've agreed this morning, we've got some fundamental points that are gonna have to be submitted to Your Honor.*

> \*  \*  \*  \*  \*  \*

Doc. 121, p. 7. The court then pointed out that this case is the oldest *qui tam* case of this sort involving this Defendant on a federal court docket. *Id.,* p. 8. The court made it clear that it would not tolerate "churning" in the case, but demanded that counsel assist in "grabbing the nettle and getting it decided." *Id.,* p. 9. *In particular,* the court asked:

THE COURT:

> What I want to know, are there any discovery problems lurking out there that we can—might be able to talk about today and maybe resolve? You know, I—so we don't have to deal with motions to compel.

> \*  \*  \*  \*  \*  \*

> So are there any—any discovery motions, now, that we can talk about, so we don't have to go through a motion to

---

7. Defendant has presented a scholarly, thoughtful argument for striking the balance as did Judge Vinson in the *Reichhold* case. Doc. 135, pp. 8–13 and attachments.

8. Rehearing was denied on October 16, 1995. Doc. 159, ex. A.

compel and the response and then an order?

*Id.,* pp. 10–11.

Counsel for Plaintiffs eventually brought up the question of attorney-client and work product privileges which had been litigated before the Public Service Commission and the Florida Supreme Court, characterizing this as "a complicated issue." The court was informed that these questions had twice been before the Florida Supreme Court, and that that court had left intact the Public Service Commission's last rulings on the subject. *Id.,* pp. 19–21.

Counsel for Plaintiffs then said that it was his understanding that Defendant did not intend to "claim that there is a different legal—federal legal standard with respect to the attorney-client and work product issues than was decided in the state proceedings." *Id.,* p. 22. At this point, counsel for Defendant represented:

MR. WINICKI:

> *With respect to the investigative reports. We have consistently taken the position that we will abide by the Florida Supreme Court decision.* The Florida Supreme Court decision came out early in, I think, spring of 1994 that somewhat split the difference of opinion between Southern Bell and Public Counsel.
>
> Public Counsel took the position you could never have attorney-client privilege for a regulated utility. We won on that. *Then the court went document by document or category by category and said some · of these are not privileged, some of them are. I have told and represented to everybody we are not gonna relitigate those issues.*
>
> \*    \*    \*    \*    \*    \*
>
> We have taken the position, and we also have taken the position that if you can get [the documents] through the Public Records Act, go ahead and get it. . . .
>
> \*    \*    \*    \*    \*    \*
>
> But what we are not gonna do, and *here is where the heart of the dispute is,* we are not gonna waive the self-critical

analysis federal evidentiary privilege. . . .

\*    \*    \*    \*    \*    \*

> So I have taken the position, *sure, we are not gonna relitigate state law privileges that were decided in the Florida Supreme Court, but we will litigate, at the appropriate time, the self-critical analysis privilege based upon—in essence, based on Judge Vinson's Reichhold decision.*

*Id.,* pp. 22–24.

At this point, counsel for Plaintiffs said "there is a small but important matter that I would like to get clear on, when Southern Bell refers to the Florida Supreme Court rulings." *Id.,* p. 24. Counsel accurately repeated that the Florida Supreme Court had rendered its initial opinion, the Public Service Commission had applied the opinion making an "individualized determination on each of these categories of documents," and those orders were taken again to the Florida Supreme Court and upheld. *Id.* Counsel then summarized:

> If what I understand Southern Bell to be saying is that they will not relitigate the determinations that were made by the Florida Public Service Commission and upheld by the Florida Supreme Court on attorney-client and worked [sic] product, and that essentially they have been found to not have privileges of attorney-client and work product with respect to the employee statements and the internal rights [audits?], then we can save a lot of paper and simply litigate the self-critical analysis privilege.
>
> \*    \*    \*    \*    \*    \*
>
> But truly, Your Honor, we can—we can cut through half of the issues if Bell was either withdrawing their claim of attorney-client privilege or work product with respect to the internal investigation.

*Id.,* pp. 25–26.

The Court turned to Defendant's counsel and said: "All right. Let's find out, is that what you are saying, Mr. Winicki?" *Id.,* p. 26. This inquiry elicited the following:

MR. WINICKI:

What I am saying is *what we have consistently said for two years on this.*

THE COURT:

Yeah. You are gonna—

MR. WINICKI:

*With respect to the determination by the Florida Supreme Court on attorney-client and work product, we do not intend to relitigate that issue. But we do intend to litigate the issue of self-critical analysis privilege with respect to those documents.*

*Id.*

At the time these representations were made, Defendant was represented by *five* attorneys whose names appear on page 2 of doc. 121. If Mr. Winicki, through some understandable human error, misstated Defendant's position, surely one of those seasoned attorneys would have clarified the matter. Moreover, the court could not have made it clearer to both sides that this case was dragging on too long, with litigation over issues which did not need to be litigated, whether for the first time, or as this one, again.[9]

■ A trial court has inherent authority to regulate the litigation before it and to estop parties from breaking promises made by counsel. *Zebrowski v. Hanna,* 973 F.2d 1001, 1004–1005 (1st Cir.1992). Defendant now seeks not only to relitigate, document by document, its claim of attorney-client and work product privilege, but seeks to open a collateral suit, with full discovery into whether the Florida Public Service Commission (and presumably the Florida Supreme Court) denied it due process. These issues have been litigated before the Florida Supreme Court and the Florida Public Service Commission. Relitigation in this court is an unnecessary waste of the resources of a regulated utility, will add significant additional cost to the just resolution of Plaintiffs' claims, and will delay the final determination of this cause. Given the complexity and age of this case, Defendant must honor its clearly made promises to the court and to Plaintiffs.

Accordingly it is ORDERED that:

1. Plaintiffs' motion to compel, doc. 125, is GRANTED. Defendant shall produce for inspection and copying the documents sought by the motion on or before 30 days from the docketing of this order. If an objection is timely filed to this order, compliance is stayed. To the extent this order may be affirmed by the district judge, the time for compliance shall be 30 days from the docketing of the district judge's order which adjudicates the objection, or as otherwise ordered by the district judge.

2. Defendant's notice of production to William D. Talbott, Executive Director, Florida Public Service Commission, is QUASHED. Defendant shall conduct no discovery relating to claims of denial of due process before the Florida Public Service Commission.

3. Plaintiffs are awarded expenses and attorney's fees limited to work related to opposition to Defendant's attempt to reopen the issue of attorney-client and work product privileges. The parties shall comply with Local Rule 54.1(E) with regard to litigation of the amount which is due.

DONE AND ORDERED.

9. "I call it churning, gentlemen, and ladies, and if that's too—too strong a word, then you give me something else...." Doc. 121, p. 27. "And I guess if you've got somebody who—whose rate is fixed by the Public Service Commission, rate is based upon the cost of doing business, if this is the cost of doing business, then there is certainly no incentive for anybody to belly-up and get this case disposed of. I'm a little concerned." *Id.*