Christine A. **PETERSON**, **Personal Representative of the Estate of Allan P. Peterson, Deceased, Plaintiff,**

v.

The **CHESAPEAKE & OHIO RAILWAY COMPANY, a Virginia corporation and E.I. Dupont De Nemours and Company, a Delaware corporation, Defendants.**

No. K84–8 CA.

United States District Court,
W.D. Michigan, S.D.

May 29, 1986.

Recidivist violators of Rule 11 may expect to pick up the entire tab.

Susan Przekop-Shaw, Lansing, Mich., for Christine A. Peterson.

W. Fred Hunting, Jr., Grand Rapids, Mich., for defendant Chesapeake & Ohio Ry. Co.

Wallson G. Knack, Grand Rapids, Mich., and Raymond Ripple with Dupont De Nemours & Co., Wilmington, Del., for defendant E.I. Dupont De Nemours & Co.

## OPINION

HUGH W. BRENNEMAN, Jr., United States Magistrate.

Before the court is defendant E.I. Dupont De Nemours and Company's (Dupont) motion for a protective order. Dupont seeks to exempt from discovery the evaluation and recommendation portion of a report prepared by several of its employees concerning a tank car derailment which gave rise to this lawsuit. Dupont maintains that this portion of the report, as distinct from the factual portion, is privileged as self-critical analysis. For the reasons discussed below, the motion is denied.

### Background

In the early morning hours of August 7, 1981, fourteen of seventy-seven cars in a C & O freight train derailed while passing through Bridgman, Michigan. One of the cars contained nearly 10,000 gallons of fluorosulfonic acid (FSA) produced and shipped by Dupont. Damage to a valve on this railroad car caused over one-third of the car's contents to spill on the ground and/or be released into the atmosphere in the form of a vapor cloud. The incident resulted in a 26–hour evacuation of 1,500 people in the area. A dozen people were treated and released from local hospitals after complaining of burning eyes, skin and respiratory system irritation. Later in the month, plaintiff's decedent, a state police officer who had been assigned to establish a perimeter around the derailed tank car on

the day of the incident, died allegedly from exposure to the FSA.

Immediately upon learning of the accident, Dupont sent a team of four employees (team) from its plant in East Chicago to the scene. The team was instrumental in containing the damage. Several days later the team met to evaluate the incident and on August 19, 1981 (prior to the death of the state police officer) prepared a written factual summary of the incident entitled "FSA Tank Car Derailment, Bridgman, Michigan, August 7, 1981" (hereafter referred to as the "Bernhardt memorandum" after its writer), which contained a factual description of the events that transpired and concluded with a list of recommendations based on the team's evaluation of the incident.

Plaintiff, Christine A. Peterson (Peterson), as personal representative of the estate of the deceased, has filed a diversity action in this court alleging among other things that Dupont was negligent in failing to warn the decedent of the dangers to his health posed by the FSA spill, in failing to provide him with proper instruction and equipment which would have decreased or eliminated the dangers to his health posed by the FSA, in failing to effectively prevent FSA from leaking from the derailed tank car and in failing to effectively rid the environment of the effects of the spill.

Pursuant to Peterson's discovery request, Dupont has furnished the factual portions of the Bernhardt memorandum but has refused to divulge the evaluation and recommendation portion at the end of the report and now seeks a protective order on the basis that it should not have to supply a self-critical analysis done by its own employees.

*Discussion of Law*

Dupont maintains that the evaluation performed by the 4–man team following the tank car derailment constitutes self-critical analysis and that in the circum-

stances of this case there is a strong public consideration making such an analysis privileged.

■ Rule 26(b)(1), Federal Rules of Civil Procedure, permits discovery of any relevant matter not privileged. It is generally held that the concept of "privileged" as used in Rule 26(b) corresponds with the concept of privilege as developed in the law of evidence. Thus, the scope of privilege in discovery is neither broader nor narrower than the scope of privilege at trial, and what is privileged under the law of evidence has been taken as a measure of that which is privileged from discovery. *See,* 4 Moore's Federal Practice, § 26.60[1].

■ The federal rules of evidence regarding privileges, which is applicable to all stages of all actions and proceedings, FRD 1101(c), provides that privileges are governed by common law principles as interpreted by the federal courts, but that with respect to an element of a claim or a defense as to which state law supplies the rule of decision, privileges are determined in accordance with State law. FRE 501. Thus, on State law claims the question of privilege is governed by State law. *Somer v. Johnson,* 704 F.2d 1473 (11th Cir.1983); 4 Moore's Federal Practice, § 26.60[7] and n. 20. Since this is a diversity action and plaintiff seeks to establish among other things negligence under state law on the part of Dupont in its alleged failure to properly handle the FSA and the situation resulting from its spill, any privilege regarding the recommendations of Dupont's own employees at the scene, which are contained in the evaluation section of the report, should be determined in accordance with Michigan law.[1]

Michigan has yet to adopt a statutory self-critical analysis privilege. Dupont, however, points to M.C.L. § 29.7c, which renders immune from civil liability those who provide assistance at an accident scene involving the transportation of hazardous

---

**1.** In light of plaintiff's contentions that Dupont was negligent in fulfilling its responsibilities in the aftermath of the spill, I find that, if not privileged, the information sought is relevant to the issues in question for discovery purposes.

material, as evidence of Michigan's public policy of encouraging efforts aimed at controlling potentially hazardous accidents such as the one that occurred in Bridgman, Michigan. Treating a self-critical analysis of one's efforts during a disaster as privileged, the argument goes, furthers the purposes of this policy, while denying the privilege would chill efforts to improve one's ability to respond in these situations.

While Dupont's logic is persuasive, it can conversely be argued that the legislature, obviously aware of the dangers entailed in the shipment of hazardous substances (as evidenced by its passage of M.C.L. § 29.7c) has thus far declined to adopt the privilege in question.

Nor does there appear to be any Michigan case law recognizing a self-critical analysis privilege under these circumstances. The only two Michigan cases cited by Dupont which discuss the self-critical analysis privilege were both federal court actions and neither was a diversity action. *Bergman v. Kemp,* 97 F.R.D. 413 (W.D. Mich.1983) (*Bivens* action); *Roberts v. National Detroit Corp.,* 87 F.R.D. 30 (E.D. Mich.1980) (Title VII action under Civil Rights Act of 1964). The court has not been made aware, and has not found any other Michigan authority recognizing the existence of a privilege to withhold a critical self-evaluation analysis under these circumstances.

Thus, based on the law of privileges in accordance with the Michigan statutes and case law, I cannot find this material protected.

Nevertheless, the analysis should not stop here. If it is true as some commentators have suggested, see, for example, Note, The Privilege of Self-Critical Analysis, 95 HARV.L.REV. 1083 (1983), that the common law privileges doctrine is fluid rather than static, and should reflect at least in part the evolving considerations of public policy, that much of the law of privileges is uniquely judge-made, and that the self-critical analysis privilege is in the early stages of development, then the court should at least explore the possibility of whether the privilege might have application here by examining the privilege itself.

[redacted] The elements of this evolving privilege have not yet been crystalized. Three commonly accepted elements generally assigned to the privilege protecting critical self-analysis emerge from a reading of *Bredice v. Doctors Hospital, Inc.,* 50 F.R.D. 249 (D.D.C.1970), 51 F.R.D. 187 (D.D.C.1970), *aff'd,* 479 F.2d 920 (D.C.Cir. 1973) are (and are further articulated in the Harvard Law Review article, *supra* at 1086). These are:

1. The information to be shielded from discovery must result from a critical self-analysis undertaken by the party seeking protection.
2. The public must have a strong interest in preserving the free flow of the type of information sought.
3. The information must be of the type whose flow would be curtailed if discovery were allowed.

Implicit in the third element, I assume, are the understandings that the evaluation or analysis must be actually be performed with the expectation that the analysis will remain confidential, *see, Bredice v. Doctors Hospital, Inc., supra* at 250, and further that it, in fact, must be kept confidential. *Bergman v. Kemp, supra; Peck v. United States,* 514 F.Supp. 210, 212 (S.D.N.Y. 1981). Privileges suppress evidence otherwise relevant to the fair and just resolution of a conflict. It would make little sense to allow material to be protected from discovery that was not intended to be protected by those originating it, or which has subsequently been divulged by those privileged to know it to those not privileged.

Moreover, testimony, information, documents or records presented during the course of the self-critical analysis should not be immunized from discovery in a civil action merely because they have been so furnished. While a person participating in the analysis should not be required to testify as to information obtained through such participation, that person could be expected to testify in any civil action as to matters

within his or her own knowledge. *See,* e.g., WIS.STAT.ANN. § 146.38(2) (privilege of self-critical analysis for purposes of health care services review does not immunize material presented to reviewers); *Upjohn v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) (attorney-client privilege protecting disclosure of communications does not protect disclosure of underlying facts by client. A person may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney).

The second of the elements listed above is probably the one of primary concern. The public's strong interest in preserving the free flow of socially useful information undergrids the entire self-critical analysis privilege. I believe it is satisfied in this instance. The rush of scientific knowledge in recent decades has strained the ability of our various institutions to absorb and manage this knowledge. The possibility of industrial accidents has been with us for a long time. But one need only read of Bhopal, India, Chernobyl, U.S.S.R., Three Mile Island, and of various oil and chemical spills, etc., to realize that, whatever precautions may be in place, there is now also present the possibility of extremely widespread damage from a single accidental leak, spill or explosion in our industrial and scientific communities. This is to simply state the obvious. Consequently, the law must be sufficiently flexible to allow development of adequate responses to these incidents when they occur.

Michigan has already recognized the need to encourage persons to render assistance in these situations. See, for example, M.C.L. § 29.7c. The severity and magnitude of incidents of the type in question, however, necessarily demand sophisticated responses. For reasons of public health and safety alone, it would seem imperative that those entities responsible for formulating the appropriate responses must be free to review their procedures, including past mistakes, without fear that their candor will return to haunt them in some future civil proceeding.

■ I also find, however, that there has been sufficient noncompliance with other elements of this privilege to hold that the privilege, to the extent it exists, would not be applicable under the particular circumstances of this case. First, I find from a review of the arguments, and the deposition of employee Bernhardt, the team member who authored the memorandum, no evidence to suggest that the team actually expected its analysis and memorandum to be held in strict confidence either within or without Dupont. Counsel for Dupont represented that he believed such analysis were done as a matter of routine, and there is nothing to indicate that such reports have been customarily treated as strictly confidential in the past.

Second, the contents of the analysis section of the Bernhardt memorandum have not been held in strict confidence in this case. Bernhardt testified to most of this portion of the report during his deposition, without objection. Bernhardt Deposition, Jan. 31, 1985, pp. 31–32. *See, Malco Mfg. Co. v. Elco Corp.,* 307 F.Supp. 1177 (E.D. Pa.1969) (To the extent that a party answers interrogatories relating to the contents of a privileged communication between himself and his attorney, and makes no objection, he has waived the privilege).

Third, plaintiff argues that the analysis in this case does not appear to be a true "critical self-analysis" undertaken by the party seeking protection, as that term has been used in other cases. In this instance, the analysis was performed by those persons actually involved in the incident giving rise to the lawsuit. The privilege cannot serve to shield from discovery their knowledge, understanding and evaluation of the incident, to the extent it would be otherwise admissible, merely because they have reviewed the same amongst themselves. Rather, the self-critical analysis is better performed by objective and knowledgeable reviewers, probably at a policy-making level, who were not personally involved in the incident. The fact that such reviewers were not personally involved does not ren-

der them incapable of making an informed analysis, since they would be free to draw upon the knowledge and observations of the participants in the incident. This type of more formalized review lends credence to the review as meriting the self-analysis privilege, accomplishes the purpose for which the privilege was intended, and by· not precluding other parties from obtaining information to which they are rightly entitled, prevents abuse of the privilege which would ultimately work to its detriment. The privilege would not be attractive if it simply lent itself to all casual reports that contained any element of evaluation or recommendation.

### Conclusion

The law of privileges as articulated in the Michigan statutes and Michigan case law does not accord defendant the protection sought. Although I believe there is merit in the argument for recognition of a self-critical analysis privilege which would facilitate improved responses to hazardous scientific and industrial accidents, such a privilege, if it exists, would not be applicable to the facts of the present case.

The motion for a protective order will be denied.