**IN RE AIR CRASH NEAR CALI, COLOMBIA ON DECEMBER 20, 1995.**

No. 96–MD–1125.

United States District Court, S.D. Florida.

Feb. 7, 1997.

Aaron Podhurst, Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin, P.A., Miami, FL, for Plaintiff.

Howard Barwick, Barwick, Dillian, Lambert & Ice, P.A., Miami, FL, Christopher H. Knight, Fowler, White, Burnett, Hurley, Banick & Strickroot, P.A., Miami, FL, for Defendant.

MARCUS, District Judge.

### ORDER

THIS CAUSE comes before the Court upon the Defendants' "Motion for Reconsideration of October 1, 1996 Order," filed October 11, 1996. The pending motion concerns the Defendants' claim of a privilege for certain documents prepared pursuant to the American Airlines Safety Action Partnership ("ASAP") program. In reliance on this perceived privilege, America has refused to produce 23 documents that otherwise are responsive to the PSC's production requests. The initial round of briefing on this issue was completed in November, 1996. On December 13, 1996, the Court received an *amicus* submission from the Air Transport Association of America ("ATAA"), a non-profit organization that "represents the interests of the U.S. commercial airline industry before the United States Congress, federal agencies, state legislatures and before federal and state courts." ATAA Mem., at 2–3.[1] The Plaintiffs responded to the *amicus* brief on December 23, 1996.

After a thorough review of the record and pleadings, and being otherwise advised in the premises, the Defendants' motion is GRANTED IN PART. The Court finds, on this record, that the ASAP materials are entitled to a qualified privilege. Nevertheless, American shall submit all of the pertinent ASAP documents *in camera* for Court review within fifteen (15) days of the date of this Order. The PSC may attempt to overcome this qualified privilege upon a sufficiently particularized showing of substantial need and undue hardship.

### I.

This litigation arises out of the crash of American Airlines flight no. 965 ("Flight 965") on December 20, 1995 near Cali, Colombia. One hundred fifty-nine passengers and crew members died as a result of the crash, with another four passengers suffering non-fatal injuries. The initial lawsuit was filed on December 29, 1995. Since then, over 130 additional lawsuits have been consolidated before this division of the Southern District of Florida. A nine-member steering committee (the "PSC") represents the Plaintiffs in these consolidated cases.

In May of 1996, the PSC served its initial request for the production of documents by American Airlines. American responded with a series of privilege logs referencing some of the sought-after materials. On July 22nd, the PSC moved to compel production of documents identified in these logs. In an Order dated October 1, 1996, the Court rejected American's argument that documents not falling within the work product or attorney-client privileges could be withheld under the so-called "self-critical analysis" privilege. We also directed American to submit *in camera* the relatively small number of documents for which it claimed work product or attorney-client protection.[2] On October 11th, the Defendants filed the instant motion for reconsideration of the October 1st Order, to the extent that it requires production of two documents prepared in conjunction with the ASAP program. These two documents are identified in exhibit "A" to its motion and have been submitted *in camera*. Since that time, American has identified 18 additional documents that, it asserts, were prepared in connection with the ASAP program. An updated list of the 20 documents at issue appears in the Defendants' amended exhibit "A", which is attached to their reply brief. On October 31, 1996, the Defendants uncovered another three ASAP documents.[3] At no

---

1. The PSC describes the ATAA as an "airline industry lobbying consortium."

2. In an Order dated December 13, 1996, the Court directed the production of most of the materials we had received *in camera*. In so doing, however, we continued to reserve ruling on the two ASAP documents.

3. American has not explained why these documents were not discovered in time for their inclusion in the initial round of privilege logs. The newly discovered documents have not been submitted *in camera*, although American has indicated its willingness to provide them to the Court on this basis.

point in its privilege logs or in its memorandum in opposition to the motion to compel did American seek unique treatment for the ASAP materials.

## II.

American's explication of the ASAP program is contained principally in the affidavit of Scott Griffith, the managing director of flight operations safety for the airline. *See* Def. Notice of Filing Revised Executed Aff., October 12, 1996. The affidavit explains that the ASAP program is an initiative undertaken in 1994 by the Federal Aviation Administration ("FAA" or "Agency"), the Allied Pilots Association ("APA") and American Airlines. It is a "voluntary pilot self-reporting program designed to encourage pilots to report incidents and violations." *Id.* at ¶ 4. The objectives of the program "are to identify and to reduce or eliminate possible flight safety concerns, as well as to minimize deviations from Federal Aviation Regulations ['FAR's]. This could include altitude, heading, speed and other deviations during flight, taxiway or runway incursions during ground operations, and navigational or terrain-avoidance problems." Def. Mot., at exh. C–1. Pilots' reports, which may contain self-disclosure of possible FAR violations or recount general flight safety concerns, are collected electronically. "Upon submission, the de-identified reports are reviewed on a weekly basis by a joint committee comprised of representatives from American, FAA and APA who in turn issue pilot advisories, procedure changes and individual skill enhancement recommendations," with an eye toward evaluating "changes in flight and training procedures and implement[ing] other corrections that may prevent further incidents." Griffith aff. at ¶ 5. The reports are kept confidential, and the identity of the reporting pilots cannot be disclosed outside of ASAP. Indeed, pursuant to a proposed FAA Advisory Circular, records submitted to the FAA for review in conjunction with ASAP programs will be exempted from the disclosure requirements of the Freedom of Information Act. *Id.* Moreover, "[i]nformation from ASAP reports will not be used to initi-

ate or support an investigation of non-reporting airmen." Def. Mot., at exh. C–1.

Independent of the guarantee of confidentiality, pilots are given a strong practical incentive to disclose real and apparent violations of FAR's. Under the ASAP program, pilots who self-report minor, inadvertent violations may not be subject (if certain conditions and prerequisites are met) to license revocations or other enforcement actions by the FAA. Instead, the reporting pilot may be subject to "administrative action" in the form of a letter of correction (which does not contain a finding as to whether a violation actually occurred). Def. Mot., at exh. C–1. Letters of correction, when issued, are made a matter of public record for two years, after which they are expunged. *Id.*[4] Moreover, "[i]n cases where the airman is the sole source of information indicating a possible violation of FAR's, every consideration will be given to corrective matters that do not involve FAA administrative action." *Id.* Although the ASAP program apparently has not been extended fully to air carriers other than American, some observers view it as a "prototype for future partnership programs between the airlines and the FAA to promote safety." ATAA Mem., at 1 (citing exh. 1). ASAP is one of several voluntary-reporting initiatives undertaken in recent years. *See* Def. Mot., at exh. C–1.

## III.

■ Our starting point is Rule 26(b)(1) of the Federal Rules of Civil Procedure, which permits discovery "regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, [and] need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." In order to preserve the liberal discovery contemplated by the Federal Rules, the burden falls on the party opposing discovery—in this instance, American Airlines—to prove its entitlement to a privilege for otherwise relevant documents. *See, e.g., In re Air Crash Disaster at Sioux City,*

---

4. The recent proposed FAA Advisory Circular indicates that a pilot may be subject to enforcement action even if the case is closed, if evidence later establishes that the reported violation should have been excluded from the protections of the ASAP program. *Id.*, exh. C–3.

*Iowa,* 133 F.R.D. 515, 518 (N.D.Ill.1990) (reaffirming the well-settled proposition that "the party seeking the privilege has the burden of establishing all of its essential elements").

American seeks protection for the ASAP materials on one of two theories. First, it suggests that the materials fall within the "self-critical analysis" privilege. Second, it suggests, in more indirect terms, that we should recognize a new, common law privilege for materials produced in connection with the ASAP program.

■ The Court is unpersuaded that the self-critical analysis privilege applies in this context. We discussed the contours of this privilege in the Order of September 26, 1996:

> The Defendant acknowledges that the Eleventh Circuit has not recognized this broad privilege in a case similar to the one at bar. According to American, however, facts and opinions obtained during a airline's retrospective investigation of a crash should be precluded from discovery, in order to ensure that commercial airlines remain free to undertake thorough, searching and honest review of what went wrong, with an eye toward protecting passengers from similar incidents in the future. As American sees it, such a review cannot take place if the airline's investigators fear that any incriminating findings will be divulged to outsiders. At least under the facts and circumstances of this case, we are unwilling to recognize a self-critical analysis privilege.
>
> The first problem is one of definition. What American describes as the "self-critical analysis privilege" has been given different names and applied in widely different contexts by the courts. *See Tharp v. Sivyer Steel Corp.,* 149 F.R.D. 177, 179 n. 5 (S.D.Iowa 1993) (collecting cases). For example, some courts have created a privilege for physician "peer reviews" concerning the quality of patient care. *See Bredice v. Doctors Hospital, Inc.,* 50 F.R.D. 249 (D.D.C.1970), *aff'd without op.,* 479 F.2d 920 (D.C.Cir.1973). Other courts have recognized a privilege for internal reports that evaluate a company's historical compliance with environmental regulations. *See Reichhold Chemicals, Inc. v. Textron, Inc.,* 157 F.R.D. 522 (N.D.Fla.1994). Still other courts have extended a privilege to a company's internal assessment of its equal employment opportunity practices. *See Banks v. Lockheed–Georgia Co.,* 53 F.R.D. 283 (N.D.Ga.1971). But against the backdrop of these decisions is an equally compelling line of cases that reject claims of self-critical analysis privilege. *See, e.g., Tharp,* 149 F.R.D. at 184 (declining to recognize privilege for internal affirmative action compliance materials); *Witten v. A.H. Smith & Co.,* 100 F.R.D. 446 (D.Md. 1984) (same); *Mao–Shiung Wei v. Bodner,* 127 F.R.D. 91 (D.N.J.1989) (criticizing the privilege for medical peer review records). We are aware of no case recognizing a self-critical analysis privilege under circumstances similar to those before us.... Even those courts recognizing the self-critical analysis privilege have acknowledged its restrictions and limitations. First, as *Southern Railway* suggests, the privilege typically extends only to subjective impressions and opinions contained in a written report, not objective facts. *See Webb v. Westinghouse Elec. Corp.,* 81 F.R.D. 431, 434 (E.D.Pa.1978). Second, the privilege makes sense only when the protected information "must be of a type whose flow would be curtailed if discovery was allowed." *Dowling v. American Hawaii Cruises, Inc.,* 971 F.2d 423, 425–26 (9th Cir.1992). Third, the privilege arguably may not apply when the materials are relevant to the investigation of a federal regulatory agency. *See Federal Trade Comm. v. TRW, Inc.,* 628 F.2d 207, 210–11 (D.C.Cir.1980) (refusing to permit defendant to invoke a self-critical analysis privilege in response to a government subpoena). And fourth, "no [material] should be privileged unless it was prepared with the expectation that it would be kept confidential, and has in fact been kept confidential." *[Textron ],* 157 F.R.D. at 527 (quoting *Dowling,* 971 F.2d at 426). In other words, unless the report is prepared for *purely* internal review purposes, no self-critical analysis privilege should attach.
>
> These limitations reflect an ambivalence with the potentially extraordinary sweep of the self-critical analysis privilege, which conceivably could permit a defendant in

the position of American Airlines to prevent *any* discovery into its post-accident review process. We observe that privileges are disfavored in the law, because they impede rather than further the quest for the truth. *See Trammel v. United States,* 445 U.S. 40, 50 [100 S.Ct. 906, 912, 63 L.Ed.2d 186] (1980).... The most compelling rationale for recognizing a self-critical analysis privilege in a case like this is to ensure that there is no real or perceived "chilling effect" on a company's post-accident review process. But we can divine no meaningful risk of chill here, since American has undertaken to "aggressively investigate" itself not just for purposes of internal quality control, but also in order to prepare a defense to this lawsuit, draft appropriate submissions to the NTSB and the Colombian authorities and marshal evidence to present to the media in an effort to ease any public concern. For these reasons, we decline to recognize any self-critical analysis privilege under the facts and circumstances of this case. To the extent that impressions and opinions of American's investigatory team may be protected, the work product doctrine provides the appropriate framework for relief.

The touchstone of a self-critical analysis is that it is an "in house" review undertaken primarily, if not exclusively, for the purpose of internal quality control. Even assuming that the materials prepared by American's pilots in conjunction with the ASAP program may be of a type whose creation might be curtailed if discovery is allowed, these materials were prepared for dissemination to representatives of entities unaffiliated with American (a federal regulatory agency and a union). Moreover, while American's participation in the ASAP program may be undertaken with an eye toward improving the safety and performance of American Airlines flights, American's submissions indirectly assist the FAA and the APA in analyzing trends and developing strategies for the improved safety of all commercial aircraft.[5]

We are aware of no case law recognizing a self-critical analysis under analogous facts and circumstances.

■ That being said, American has made a compelling argument for recognition of a limited common law privilege for the ASAP materials. The PSC does not dispute the ability of this Court to recognize new privileges, consistent with Rule 501 of the Federal Rules of Evidence, in cases arising under federal law. In the recent case of *Jaffee v. Redmond,* —— U.S. ——, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996), the United States Supreme Court discussed the principles that must be brought to bear in evaluating claims of federal common law privilege. At the outset, a court must consider the "private interests" involved; in other words, whether dissemination of the information will chill the "frank and complete disclosure of facts" shared in an "atmosphere of confidence and trust." *Id.* at ——, 116 S.Ct. at 1928. Next, a court must consider the "public interests" furthered by the proposed privilege. *Id.* at ——, 116 S.Ct. at 1929. A court also should consider the "likely evidentiary benefit that would result from the denial of the privilege." *Id.* at ——, 116 S.Ct. at 1929. Finally, a court may consider the extent to which the privilege has been recognized by state courts and legislatures. *Id.* at —— – ——, 116 S.Ct. at 1929–30. The Supreme Court applied these principles to affirm the Seventh Circuit's recognition of a psychotherapist-patient privilege, noting that a psychotherapist's ability to help her patients " 'is completely dependent upon [the patients'] willingness and ability to talk freely,' " and adding that "[t]he mental health of our citizenry ... is a public good of transcendent importance." *Id.* at —— – ——, 116 S.Ct. at 1928–29. *Jaffee,* while inapposite on its facts, provides a useful framework for our analysis of American's claim of privilege.

1. *Private Interests:* American argues that recognizing a privilege for ASAP materials furthers the legitimate interests of the

---

**5.** In its October 31st "Notice of Supplemental Production," American indicates that it "confidentially" provides copies of the ASAP reports of its pilots to the NASA Aviation Safety Reporting System and the Allied Pilots' Association's National Safety Committee "in an effort to guaran-

tee that everyone in the aviation industry is made aware of all possible safety concerns identified by its pilots." These reports are redacted to "ensure[ ] complete anonymity and confidentiality" by removing references to the identity of the pilot and the airline.

airline, the pilots and the FAA. Commercial air carriers like American have a powerful economic incentive in encouraging the flow of information that may be used to improve the safety of their flights. The affected pilots have a compelling interest in using incidental violations and suspected flight safety concerns as an opportunity to receive training and feedback that may prevent the recurrence of these or more serious incidents. The FAA, as the regulatory body chiefly responsible for monitoring the safety of commercial air traffic, plainly has an interest in being made aware of incidental violations, so it can provide training and advice for the affected pilots and develop data on apparent trends in air traffic safety. All of these interests are furthered by a privilege that would ensure the confidential nature of materials circulated in conjunction with the ASAP program.

2. *Public Interests:* American contends, and the PSC rightly acknowledges, that there is a powerful and compelling public interest in improving the safety of commercial air travel.

3. *Evidentiary Benefit from Denying the Privilege:* American argues that many FAR violations currently reported to the FAA would be kept secret if the pilots believed that their reports might be used in litigation or otherwise disseminated to the public. In other words, if we were to refuse to recognize a privilege for ASAP materials, these written materials might no longer be produced and the evidentiary tap might be shut off. *See Jaffee,* —— U.S. at ——, 116 S.Ct. at 1929 (observing, in the context of the psychotherapist-patient privilege, that "[w]ithout a privilege, much of the desirable evidence to which litigants … seek access … is unlikely to come into being. This 'unspoken' evidence will therefore serve no greater truthseeking function than if it had been spoken and privileged"). According to Griffith, "[d]isclosure of confidential ASAP materials would likely reduce the willingness of pilots to report incidents" and "seriously damage and probably terminate a uniquely successful safety program." Other materials endorse Griffith's suggestion that the ASAP program relies on an assumption of strict confidentiality. *See, e.g.,* aff. of Stuart Matthews, Oct. 26, 1996 (summarizing views of

the president and CEO of the "Flight Safety Foundation"); aff. of E.V. Fretwell, Oct. 22, 1996 (summarizing the views of a manager of the "Air Lines Pilots Association"). Like Griffith, Matthews and Fretwell aver that voluntary reporting under ASAP would be hampered severely if pilots and airlines knew that the reports might be used against them in litigation. We agree that, without a privilege, pilots might be hesitant to come forward with candid information about in-flight occurrences, and airlines would be reluctant, if not altogether unwilling, to investigate and document the kind of incidental violations and general flight safety concerns whose disclosure is safeguarded by the ASAP program.

The PSC raises three counter-arguments. First, it contends that permitting public dissemination of the ASAP materials will not deter American or its pilots from participating in the program. As noted above, the ASAP program contemplates that, at least in certain contexts, a pilot's voluntary disclosure of minor, inadvertent FAR violations may immunize him from enforcement action that might otherwise be imposed if the Agency discovered the violation through independent sources. But the ASAP program contemplates the confidential reporting of not only FAR violations, but also perceived flight safety hazards that otherwise might never be brought to light. In the case at bar, for example, American's ASAP submissions in the wake of the Cali crash plainly were not generated by the affected pilots with an eye toward avoiding FAA enforcement action. Moreover, at least some "deviations" from FAR's are unlikely to be brought to the attention of the Agency by independent sources.

Second, the PSC suggests that American's concerns about confidentiality may be alleviated by a protective Order requiring any ASAP materials disclosed in this case be kept under seal and redacted to conceal pilot names. As American points out, however, the prospect of ASAP reports being used by adverse parties in the course of litigation undoubtedly will affect the content, timeliness and candor of the reports submitted by its pilots—even if the affected pilots were

assured that their names would not be disclosed. *See* Griffith aff. at ¶ 7 (stating that the program "relies upon the strict confidentiality of the reports to encourage honest, complete and immediate reports by American pilots"); *cf. Bradley v. Melroe Co.*, 141 F.R.D. 1, 3 (D.D.C.1992) (commenting that "it is not realistic to expect candid expressions of opinion ... knowing that such statements or suggestions may very well be used against colleagues and employees in subsequent litigation").

Third, the PSC contends that recognizing a privilege for the ASAP materials will provide the airlines with a device "by which every incident reported can be kept secret and plaintiffs in litigation might never be able to prove notice of a hazard or danger." In essence, the PSC's concern appears to be that pilots will use the confidential ASAP program as the sole vehicle for disclosing occurrences and incidents that otherwise would be documented in materials possibly subject to pre-trial discovery. While the Plaintiffs' concern is legitimate, it is not persuasive, at least at this stage and under these circumstances. Presumably pilot errors that go beyond the inadvertent or incidental are documented or recorded outside of the ASAP program, by regulators, air traffic controllers or the airlines themselves. Moreover, the kind of incidental violations and general flight safety concerns whose disclosure is shielded by the ASAP program typically would remain wholly undocumented or unrecorded absent the ASAP program. We find, therefore, that the evidentiary value of denying the proposed privilege may be minimal at best.

**4. *Recognition of the Privilege in the States:*** The Court is aware of no state or federal court that has recognized the privilege claimed by American. Nor are we aware of any legislative enactment, state or federal, that recognizes the privilege. Perhaps for this reason, the ATAA argues that this *Jaffee* factor should take into account the extent to which the confidentiality concerns giving rise to the claimed privilege have received "general support" in other fora. We agree. American correctly notes that the

usefulness of confidential preventive analysis in assessing and eliminating potential safety risks has been recognized by state and federal courts applying the self-critical analysis privilege. *See, e.g., Textron*, 157 F.R.D. at 526–27. American also highlights a number of federal statutes and regulations that illustrate the national legislative commitment to air traffic safety, as well as the usefulness of voluntary disclosure in achieving this goal. *See* ATAA Mem., at 11–12. For example, section 402(a) of the recently enacted "FAA Reauthorization Act" forbids the FAA from disclosing to the public certain safety-related information voluntarily submitted to it. Pub.L. No. 104–264, 110 Stat. 3213 (1996).

Pulling all this together, the Court is persuaded that American has met its burden of proving that, under these facts and circumstances, a qualified "ASAP privilege" is appropriate. The ASAP materials in dispute (unlike the vast majority of the documents prepared by American in the wake of the crash) were prepared voluntarily, in confidence and for use in a discrete, limited context in cooperation with the FAA and the pilots' union. There is a genuine risk of a meaningful and irreparable chill from the compelled disclosure of ASAP materials in connection with the pending litigation.

 In making this finding, we stress that the privilege recognized here is qualified rather than absolute.[6] Like any evidentiary privilege, an "ASAP privilege" must be harmonized with the notion that " 'the public ... has a right to every man's evidence.' " *United States v. Bryan*, 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950); *see also United States v. Nixon*, 418 U.S. 683, 709–10, 94 S.Ct. 3090, 3108–09, 41 L.Ed.2d 1039 (1974) (noting that privileges should not be "lightly created nor expansively construed, for they are in derogation of the search for truth"). In order to breathe life into these principles, courts have been loathe to recognize absolute privileges. The closest analog to the privilege now sought by American— the self-critical analysis privilege—has been viewed as a qualified privilege that may be

---

**6.** American's memoranda, like the ATAA's *amicus* brief, is unclear on whether the proposed

privilege should be qualified.

overcome upon a showing of substantial need. *See, e.g., Textron,* 157 F.R.D. at 522. Other familiar privileges are described as qualified rather than absolute. *See, e.g., Nixon,* 418 U.S. at 705–706, 94 S.Ct. at 3106–3107 (recognizing qualified privilege for confidential Presidential communications); *In re Certain Complaints Under Investigation,* 783 F.2d 1488, 1518–22 (11th Cir.) (recognizing qualified privilege protecting confidential communications among judges and their staffs in the performance of their judicial duties), *cert. denied sub nom.,* 477 U.S. 904, 106 S.Ct. 3273, 91 L.Ed.2d 563 (1986); *Sirmans v. City of South Miami,* 86 F.R.D. 492, 495 (S.D.Fla.1980) (recognizing qualified privilege for government files relating to an on-going criminal investigation); Fed. R.Civ.P. 26(b)(3) (creating qualified privilege for materials prepared "in anticipation of litigation or for trial," and adding that the privilege may be overcome upon a showing of "substantial need" and the inability to obtain substantially equivalent materials by other means "without undue hardship").

Even those evidentiary privileges occasionally spoken of as absolute, including the attorney-client privilege and the protection for so-called "opinion" work product, may be overcome upon a sufficiently powerful showing of relevance, need and hardship. *See, e.g., In re Grand Jury Investigation (Schroeder),* 842 F.2d 1223, 1226 (11th Cir.1987) (recognizing crime-fraud exception to the attorney-client privilege); *Holmgren v. State Farm Mut. Auto. Ins. Co.,* 976 F.2d 573, 577 (9th Cir.1992) (holding that Fed.R.Civ.P. 26(b)(3) does not require absolute protection for opinion work product, and noting that these materials "may be discovered and admitted when mental impressions are at issue in the case and the need for the materials is compelling") (citations and emphasis omitted); *Fausek v. White,* 965 F.2d 126, 129 (6th Cir.) (same holding), *cert. denied,* 506 U.S. 1034, 113 S.Ct. 814, 121 L.Ed.2d 686 (1992); *Micron Separations, Inc. v. Pall Corp.,* 159 F.R.D. 361, 365 (D.Mass.1995) (same, but noting that a " 'far higher stronger showing of necessity and unavailability by other means' is required than that for non-opinion work product") (quoting *Upjohn v. United States,* 449 U.S. 383, 401–02, 101 S.Ct. 677, 688–89, 66 L.Ed.2d 584 (1981)); *see also Jaf-*

*fee,* —— U.S. at —— n. 19, 116 S.Ct. at 1932 n. 19 (declining to qualify the psychotherapist-patient privilege, but adding that "we do not doubt that there are situations in which the privilege must give way"). As these cases suggest, no matter how compelling the need for a privilege, affording blanket, universal protection for privileged materials may run afoul of equally compelling public policy priorities. Here, although we agree that the ASAP materials should be privileged, the importance of maintaining the program's guarantee of confidentiality does not wholly erase the competing interest of the Plaintiffs, the Court and the public at large in accessing materials that may contain information highly relevant to the claim against American Airlines. For example, ASAP materials pre-dating the crash of Flight 965 conceivably might reveal that American has been on notice of hazards associated with the navigation of aircraft into the Cali airport. Evidence of this sort, as the PSC suggests, might be vital to its cause of action for willful misconduct.

We do not suggest, however, that mere generalized or speculative assertions of relevance, need and hardship suffice to overcome a qualified privilege. As the Eleventh Circuit explained in the course of recognizing a limited "judicial communications" privilege, materials afforded a qualified privilege are "presumptively privileged," and need not be disclosed unless the party seeking discovery meets its burden of demonstrating "that its need for the materials is sufficiently great to overcome the privilege." *In re Certain Complaints,* 783 F.2d at 1522. To meet this burden, the party seeking discovery must show "the importance of the inquiry for which the privileged information is sought; the relevance of that information to its inquiry; and the difficulty of obtaining the desired information through alternative means." *Id.* Even at that point the Court must "weigh the [discovering] party's demonstrated need for the information against the degree of intrusion upon the confidentiality of privileged communications necessary to satisfy that need." *Id.* In order to obtain discovery of the ASAP materials, therefore, the PSC must make a highly particularized showing of its need for the documents, and establish

that the information sought is not known or available to the Plaintiffs. The PSC has not, at least at this point, made a showing adequate to overcome American's qualified privilege.

We recognize that it may be difficult for the PSC to make a particularized showing of need and hardship without any sense of what the ASAP materials contain. This difficulty reflects the importance of the public interests giving rise to the ASAP privilege. Nevertheless, the PSC surely will be able to lay out, in some detail, the contours of its theory of the case, the nature and scope of the evidence currently within its control, what, if anything, it has reason to believe the ASAP documents might reveal and what, if any, redactions or other safeguards will minimize the perceived harm to the ASAP program and its participants. The PSC may not be in a position to make this detailed showing until the final pre-trial conference. However, if the PSC does come forward with a persuasive showing of need and hardship, the Court will review the ASAP materials *in camera,* and evaluate whether the Plaintiffs' interests overcome the powerful interests that weigh in favor of preserving the confidentiality of the ASAP documents. In order to facilitate this review, American shall promptly submit *in camera* all 23 of the ASAP documents it has identified. At this time, however, the ASAP materials shall remain privileged, and need not be produced to the Plaintiffs.

Consistent with the foregoing, it is

ORDERED AND ADJUDGED that the Defendants' Motion for Reconsideration is GRANTED IN PART. American shall submit the ASAP materials *in camera* for this Court's review within fifteen (15) days of the date of this Order.

DONE AND ORDERED.